31 Cal.Rptr. 847]

[Civ. No. 10581. Third Dist. July 3, 1963.]

CHARLES RAYMOND, a Minor, etc., Plaintiff and Respondent, v. PARADISE UNIFIED SCHOOL DISTRICT OF BUTTE COUNTY, Defendant and Appellant.

2

Grayson Price and Robert E. Burness, Jr., for Defendant and Appellant.

Peters, Peters & Hoffman and Robert Hoffman for Plaintiff and Respondent.

FRIEDMAN, J.—At the time of the injury for which he sues plaintiff Charles Raymond was 7 years old. He was a pupil at the Paradise Elementary School operated by defendant school district. He lived near the Paradise Junior-Senior High School operated by the same district. The district provided bus transportation for pupils. Defendant Alvin C. Marshall was one of its bus drivers. Marshall's bus route at the time of the accident included approximately 11 stops, the next to last stop being on the grounds of the high school and the final stop at the elementary school.

Marshall's bus had space for 62 passengers. His normal load consisted of about 25 high school students and a similar number of elementary school pupils. At the stop on the high school premises he would discharge the high school students and take on two to five more children bound for the Paradise Elementary School. Charles Raymond was among the elementary school pupils who habitually entered the bus at the stop on the high school grounds.

The various bus stops had been designated by the defendant district through its supervisor of transportation. The loading zone on the high school grounds consisted of a semicircular driveway approximately 100 feet long located at the east side of Maxwell Drive, a north-south street. Buses bound for this loading zone would drive south on Maxwell Drive, past the northerly opening of the semicircular driveway, and turn left into the southerly entrance. Faced in a northward direction, the buses would then come to a halt for the purpose of loading and unloading passengers. The inner or school side of the driveway was bordered by a sidewalk, then by lawn. The sidewalk was the immediate loading and discharge area for school bus passengers. The outer side of the driveway was separated from Maxwell Drive by a semicircular cement island.

The bus loading zone at the Paradise Junior-Senior High School was used by approximately six buses. During pupil transportation periods the buses would arrive and depart in close proximity in order to load and discharge children. Before the first bus left, one or more buses would arrive behind it. The driveway accommodated three buses simultaneously. The principal of the high school testified that use of the high school driveway as a bus stop for elementary pupils had never been brought to his attention. Aside from the efforts of the bus drivers, there was no supervision of the children as they waited for the buses.

While waiting for their bus, Charles and his companions played on the high school lawn next to the semicircular loading zone. Sometimes he and his friends would run around and wrestle on the grass. Occasionally, when a bus arrived, several of them ran toward it and alongside it as it moved up the semicircular driveway, in order to be closest to the bus door and to enter it first when the bus stopped. When Marshall, the bus driver, saw the children running he would stop the bus and warn them not to run, that they were not to

approach the bus until it came to a halt. Charles was one of the recipients of these warnings. Neither Marshall nor the other drivers brought this matter to the attention of the school authorities.

On the morning of the accident, Marshall approached the loading zone, made a left turn into the semicircular driveway and drove to the far north end at a speed of about 5 miles an hour. He saw no children running and was not aware of any untoward occurrence until one of the older students left the bus and saw Charles lying on his back on the sidewalk close to the right front wheel of the bus, which was located behind the front door. Charles' testimony, which was substantiated by several older students who saw the accident, was that he had been playing on the high school lawn; when he saw the bus make the left turn into the driveway he ran toward it, placed his left hand on the side of the bus and fell backward on the sidewalk. He admitted that he had been told by the bus drivers that he should not run in the area of the buses. His mother, who arrived shortly after the accident, told Marshall that she knew that he was not to blame and that she had warned Charles about running in their own driveway.

By special verdicts, the jury found that Marshall was not negligent in driving the bus; that the school district was not negligent in maintaining a place dangerous to children, but was negligent in failing to provide for supervision of the area; that Charles was not contributorily negligent. It returned a verdict in Charles' favor and against the district in the sum of $8,500. The district appeals from the judgment, from an order denying its motion for judgment notwithstanding the verdict and from an order denying its motion for a new trial. The last mentioned order is not appealable and that portion of the appeal is dismissed.

Education Code section 903 provides: "The governing board of any school district is liable as such in the name of the district for any judgment against the district on account of injury to person or property arising because of the negligence of the district, or its officers or employees." Defendant's primary argument on appeal is that the verdict is not supported by law in that defendant had no duty to supervise the area where the accident occurred; even so, on the assumption of a duty's existence, that defendant school district complied with it.

Counsel for defendant have accurately selected the question of duty as their prime target. A finding of negligence turns upon two elements, first, the existence of a duty to use care, and second, a breach of such duty by the creation of an unreasonable risk of harm. (*McEvoy* v. *American Pool Corp.*, 32 Cal.2d 295, 298 [195 P.2d 783]; *Routh* v. *Quinn*, 20 Cal.2d 488, 491-492 [127 P.2d 1, 149 A.L.R. 215]; Rest., Torts, § 281 a, b.) A third element necessary to establish actionable negligence, is proximate cause. (Cases cited 35 Cal.Jur.2d 549, fn. 2; Rest., Torts, §§ 281, 430.) Inquiry into proximate causation, however, presupposes an affirmative finding of negligence, based upon the dual occurrence of a duty and its breach. (*Richards* v. *Stanley*, 43 Cal.2d 60, 69 [271 P.2d 23].) A duty of care, owed by the alleged wrongdoer to the injured plaintiff or to a class of which he is a member, is indispensable to negligence liability. (*Richards* v. *Stanley, supra,* 43 Cal.2d at p. 63; *Hatch* v. *Ford Motor Co.*, 163 Cal.App.2d 393, 397 [329 P.2d 605].)

One factor in the delineation of duty is the foreseeability of harm. (*Richards* v. *Stanley, supra,* 43 Cal.2d at p. 66; 38 Am.Jur. 669, Negligence, § 24; Prosser on Torts (2d ed.) 168; see Prosser, Selected Topics on the Law of Torts, Palsgraf Revisited, pp. 191-242.) Foreseeability is equally pertinent in the exploration of proximate cause, especially where an intervening act plays a contributory role in the accident. (*Eads* v. *Marks*, 39 Cal.2d 807, 812 [249 P.2d 257]; *McEvoy* v. *American Pool Corp., supra,* 32 Cal. 2d at pp. 298, 299; *Bilyeu* v. *Standard Freight Lines,* 182 Cal.App.2d 536, 542 [6 Cal.Rptr. 65].) Divergent results are possible and judicial disagreements arise by approaching negligence determinations through the gateway of duty, on the one hand, or proximate causation on the other. (See *Richards* v. *Stanley, supra,* 43 Cal.2d 60; *Mosley* v. *Arden Farms Co.*, 26 Cal.2d 213, 220-223 [157 P.2d 372, 158 A.L.R. 872], concurring opinion; Prosser, *Proximate Cause in California,* 38 Cal.L.Rev. 369, 412-415; Green, *Duties, Risks, Causation Doctrines,* 41 Tex.L.Rev. 41.)

We make these observations in view of the variant approaches of California decisions on negligence liability of school districts, some of which have been cited to us as precedents. Several cases illustrate the method of initial inquiry into the existence of duty. Thus *Kerwin* v. *County of San Mateo,* 176 Cal.App.2d 304, 307 [1 Cal.Rptr. 437], and *Girard* v. *Monrovia City School Dist.,* 121 Cal.App.2d

737, 743 [264 P.2d 115], express the rule that a school district has no duty to supervise or provide for the protection of pupils between home and school unless it has undertaken to provide transportation. (See also *Bates* v. *Escondido Union High School Dist.*, 133 Cal.App. 725, 732 [24 P.2d 884].) Another case declares that there is no duty on the district's part to anticipate (foresee) danger to the pupil caused by wilful misconduct of a fellow student. (*Reithardt* v. *Board of Education*, 43 Cal.App.2d 629, 635 [111 P.2d 440].) An apparent expression of a duty concept, found in some decisions, is the statement that a school district is required to exercise reasonable supervision over its students while school is in session, but is not an insurer of their safety at play or elsewhere. (*Woodsmall* v. *Mt. Diablo Unified School Dist.*, 188 Cal.App.2d 262, 267 [10 Cal.Rptr. 447]; *Ford* v. *Riverside City School Dist.*, 121 Cal.App.2d 554, 562-563 [263 P.2d 626]; *Weldy* v. *Oakland High School Dist.*, 19 Cal. App.2d 429, 431-432 [65 P.2d 851].)

Other decisions emphasize the element of proximate cause. Thus, claimed lack of supervision has been rejected as a proximate cause where the immediate occasion of the accident was an intervening wrong which supervision would not have prevented. (*Woodsmall* v. *Mt. Diablo Unified School Dist., supra,* 188 Cal.App.2d at pp. 266-267; *Wright* v. *City of San Bernardino School Dist.*, 121 Cal.App.2d 342, 347 [263 P.2d 25].) A negligence charge based on lack of supervision has been rejected on the theory that the district could not reasonably have foreseen an intervening wrong committed by a third party. (*Weldy* v. *Oakland High School Dist., supra,* 19 Cal.App.2d 429, 431.) In contrast, the causal relationship between lack of supervision and injury has been viewed as a fact determination, immune from appellate scrutiny when supported by substantial evidence. (*Tymkowicz* v. *San Jose Unified School Dist.*, 151 Cal.App.2d 517, 521 [312 P.2d 388]; see dissenting opinion, *Woodsmall* v. *Mt. Diablo Unified School Dist., supra,* 188 Cal.App.2d 262.)

■ Implicit in the present appeal is the thesis that this court may nullify the jury's verdict by extracting the vital essence of a duty of care on the school district's part; in other words, that the question of duty is one of law for the court, not a question of fact for the jury. To the extent that existence of a duty of care turns on conflicting evidence as to the reasonable foreseeability of injury, the question

may be one for the jury. Initially, however, presence of a duty rests upon factors other than foreseeability, and its existence is primarily for judicial determination. (*Amaya* v. *Home Ice, Fuel & Supply Co.*, 59 Cal.2d 295, 307-310 [29 Cal.Rptr. 33, 379 P.2d 513]; *Richards* v. *Stanley, supra,* 43 Cal.2d at pp. 66-67; *Hatch* v. *Ford Motor Co., supra,* 163 Cal.App.2d 393, 397; Prosser on Torts (2d ed.) 191-192; 2 Harper and James, The Law of Torts, 1058-1061; Green, Judge and Jury, 67-77.) In submitting the question of the school district's negligence to the jury, the trial judge made a preliminary determination that, granted a foreseeable risk, the school district owed a duty of care. (*Richards* v. *Stanley, supra.*) This determination was one of law, within the range of appellate review.

 The concept of duty as a question of law provides a measure for evaluating the appellate decisions on school district negligence which have been cited to us. Generally speaking, each of the proximate cause decisions turns on its own facts and has little value as precedent. (*Wright* v. *City of San Bernardino School Dist., supra,* 121 Cal.App.2d at p. 345.) A judicial declaration of duty, in contrast, may amount to a statement of law and thus create precedent, more or less influential according to its factual proximity to the case at hand.

 An affirmative declaration of duty simply amounts to a statement that two parties stand in such relationship that the law will impose on one a responsibility for the exercise of care toward the other. Inherent in this simple description are various and sometimes delicate policy judgments. The social utility of the activity out of which the injury arises, compared with the risks involved in its conduct; the kind of person with whom the actor is dealing; the workability of a rule of care, especially in terms of the parties' relative ability to adopt practical means of preventing injury; the relative ability of the parties to bear the financial burden of injury and the availability of means by which the loss may be shifted or spread; the body of statutes and judicial precedents which color the parties' relationship; the prophylactic effect of a rule of liability; in the case of a public agency defendant, the extent of its powers, the role imposed upon it by law and the limitations imposed upon it by budget; and finally, the moral imperatives which judges share with their fellow citizens—such are the factors which play a role in the determination of duty. (See Prosser on Torts (2d ed.) 182;

Green, Judge and Jury, 97 et seq.; Rest., Torts, §§ 288-293; compare *Amaya* v. *Home Ice, Fuel & Supply Co., supra,* 59 Cal.2d at pp. 310-315.) Occasions for judicial determination of a duty of care are infrequent, because in ''run of the mill'' accident cases the existence of a duty may be—and usually is—safely assumed. Here the problem is squarely presented.

A school district is under no legal duty to supply transportation to its pupils. (Ed. Code, § 16801; *Girard* v. *Monrovia City School Dist., supra,* 121 Cal.App.2d at p. 743.) Once it does so, no one would deny a concomitant obligation to provide a reasonably safe system. Statutory, administrative and judicial expressions demonstrate concern for the safe operation of vehicles engaged in the important business of transporting school children. (Ed. Code, §§ 16851-16865; Veh. Code, §§ 2807, 2808, 12516, 12517, 22112, 22357, 22412, 22452, 22454; Cal. Admin. Code, tit. 5, §§ 1060-1192; *Foster* v. *Einer,* 69 Cal.App.2d 341 [158 P.2d 978]; *Hanson* v. *Reedley etc. School Dist.,* 43 Cal.App.2d 643 [111 P.2d 415]; *Bates* v. *Escondido etc. School Dist., supra,* 133 Cal.App. 725; *Shannon* v. *Central-Gaither etc. School Dist.,* 133 Cal. App. 124 [23 P.2d 769].)

Considerations which engender a duty of care in the actual movement of school buses, or which create responsibility for supervision of pupils in the course of actual transportation, do not necessarily govern conduct of the bus stop areas. Numerous practical problems are involved. Waiting areas in rural and suburban neighborhoods are sometimes located on private property.[1] Locations may be available only with the cooperation of private owners. A stop may be used only once or twice each day by a single bus; or it may be a major loading and discharge point for numerous buses serving several schools. A single stop may be used by a dozen or more children or by only one or two. Without supervision small chilren may be expected to engage in skylarking and older chilren in what is termed ''horseplay.'' In the physical transition between home and school, parental responsibility for children's behavior does not disappear. Bus drivers may attempt to exert moral pressure; yet the impact of the driver's supervisory efforts is fairly well limited to pupils' conduct on the

---

[1]Cal. Admin. Code, tit. 5, § 1101, adopted by the State Board of Education, requires that whenever practical and possible, school bus stops shall be located off the main traveled portion of the highway and shall conform to certain visibility specifications.

buses themselves and to the actual process of entry and exit.[2] The sheer difficulty and expense of supplying supervisory personnel may impose real limitations on accident prevention. Specifically, the present appellant asserts that it and other school districts have no duty to supply supervision at school bus stops. This assertion must be measured not by theoretically possible ideals, but by the yardstick of practically attainable standards. Because of wide variations in circumstance, what is attainable in one situation may be impossible, or at least highly impractical, in another.

These considerations convince us of the inadvisability of attempting a general formulation. We deal only with the accident scene before us, not with school bus stops in general.

The loading area at which the accident occurred was not an isolated roadside stop. It was a principal pickup and discharge point. It had space for and did in fact accommodate up to three buses at one time. For a limited period each school day it was the scene of closely spaced bus arrivals and departures and the arrival and departure of up to three busloads of students. Indeed, during that limited part of each day the evidence portrays it as a rather busy transportation terminal. Frequency of use increased the accident hazard.

A second factor is the character of the pupils who used this bus terminal. Having designated it as a bus stop for primary school pupils, the district had knowledge of the presence of small children, who could not be expected to exercise the same judgment as students of the high school. The amount of care due to children increases with their immaturity. (*Satariano* v. *Sleight*, 54 Cal.App.2d 278, 283 [129 P.2d 35].) So, in all logic, do the occasions for care. The testimony of Mr. Marshall, the bus driver, bears out the increased hazard attributed to the heedless habits of the younger children. The numerical possibilities of accident at that particular location were multiplied not only by the frequency of use but also by the character of the persons involved in its use.

Thus the risks emanating from the conduct of defendant's activity were greater at this particular location than at other locations. Additionally, the location was within the complete

[2]Cal. Admin. Code, tit. 5, § 1085, provides that pupils shall be under the authority of and responsible directly to the bus driver while being transported in a school bus; also, that the driver shall be held responsible for the orderly conduct of the pupils transported.

control of the defendant. It had authority to enforce the regulatory measures necessary for the protection of children on school property. (*Taylor* v. *Oakland Scavenger Co.,* 17 Cal.2d 594, 600 [110 P.2d 1044].) Its employees, those connected with the high school, were nearby. Supervision of pupil conduct was a practical possibility. The district points out that the high school staff had no functions *vis-à-vis* the elementary school children and we agree. This is not to say that an employee could not have been detailed to supervise the loading area during the relatively brief periods of daily use.

For these reasons, we hold that as a matter of law defendant had a duty to provide adequate supervisory measures to protect children using the bus loading zone on the grounds of the high school. ▋ The district's argument that it complied with the duty stems from the fact that Marshall and other bus drivers had repeatedly warned Charles and his companions not to run toward the bus. Whether such limited supervision was adequate, that is, whether it amounted to ordinary care, was a jury question. (*Tymkowicz* v. *San Jose etc. School Dist., supra,* 151 Cal.App.2d at p. 521; *Lilienthal* v. *San Leandro etc. School Dist.,* 139 Cal.App.2d 453, 456 [293 P.2d 889]; *Satariano* v. *Sleight, supra,* 54 Cal.App.2d at pp. 284-285.)

▋ Defendant argues that uncontroverted facts demonstrate Charles' contributory negligence as a matter of law. A jury finding of contributory negligence might have been unassailable. To say that there was contributory negligence as a matter of law is another matter. Even as to adults, contributory negligence as a matter of law is rare, and a much more lenient rule is applied to minors. (*Tymkowicz* v. *San Jose etc. School Dist., supra,* 151 Cal.App.2d at p. 521; *Ross* v. *San Francisco Unified School Dist.,* 120 Cal.App.2d 185, 191 [260 P.2d 663].) Charles might have been a heedless 7-year-old with little insight into potential danger; yet it was well within the province of the jury to find against the defense of contributory negligence.

▋ The $8,500 damage award is attacked as excessive. Charles suffered two fractures in the right pelvic area, some separation and displacement of the symphysis, and a separation of the sacroiliac joint. He was hospitalized for four days, returned home, and was confined in bed for several weeks. He returned to school on crutches approximately a month after the accident and was able to discard the crutches

in June 1960, approximately seven months after the accident. Medical testimony at the trial indicated that the fractures were healed; that there was a slight abnormality in the hip joint which did not result in any lack of symmetry and did not adversely affect the range of motion; that there were some minor residual, subjective complaints. Medical expenses amounted to $401.39.

 Amount of the award is in the first instance entrusted to the jury and secondly to the trial judge on a motion for new trial. (*Carter* v. *Saxton*, 211 Cal.App.2d 836, 840-841 [27 Cal.Rptr. 671]; *Gersick* v. *Shilling*, 97 Cal. App. 2d 641, 645 [218 P.2d 583].) Appellate courts will not interfere with such an award unless it is so grossly disproportionate to any reasonable limit of compensation as to shock the court's sense of justice and raise an implication of passion and prejudice. (*Seffert* v. *Los Angeles Transit Lines*. 56 Cal.2d 498, 507-508 [15 Cal.Rptr. 161, 364 P.2d 337].)

 The present award, while generous, does not outrage us.

Judgment affirmed.

Pierce, P. J., and Schottky, J., concurred.