[Civ. No. 10598.   Third Dist.   Mar. 3, 1964.]

GORDON STROMER, Plaintiff and Appellant, v. CITY OF YUBA CITY et al., Defendants and Respondents.

James G. Changaris and John J. Trezza for Plaintiff and Appellant.

Rich, Fuidge, Dawson & Marsh and Chester Morris for Defendants and Respondents.

PIERCE, P. J.—Plaintiff refused to amend after an order sustaining a general demurrer to his complaint and appeals from the judgment of dismissal following such refusal.

The sole question presented is: Does a plaintiff real estate broker claiming damages for a commission lost from the canceled sale of an orchard, said cancellation having occurred because defendant negligently cut prune trees, belong to a class to which such defendant owes a duty of care? Both on binding precedent and reason we are compelled to answer this question in the negative.

The essential allegations of the complaint are: that plaintiff and two others owned real property (a prune orchard) near the defendant city's sewage ponds; that plaintiff, who is also a licensed real estate broker, was employed by his coowners to find a purchaser for said orchard. He did so and the deal had reached agreement with escrow instructions given by both sellers and buyers to a title insurance company containing all of the terms and conditions of the sale. Before the deal was closed, however, defendant city "did unlawfully and wrongfully enter upon said real property and did wrongfully destroy over 100 prune trees on said real property and damaged said real property." The buyer, as a result, canceled said agreement, causing plaintiff to lose his agreed-

upon real estate commission in the sum of $12,375. A second count pleads more specifically that destruction of the trees was caused by the negligent operations of a bulldozer by defendant city and its defendant employee.

Plaintiff's brief, recognizing that his right is predicated upon the law of torts and the principle "that no person has the right to destroy the business or trade of another or interfere with the contractual relations of another ... " then frankly states: "The problem in the present instance is whether appellant has successfully alleged the elements necessary to a cause of action. One of the elements that the courts have required is that the defendant had knowledge of the existence of the contract and intended to induce a breach thereof. (*Imperial Ice Co.* v. *Rossier*, 18 Cal.2d 33, 37 [112 P.2d 831].) In the present case appellant does not allege that the defendants had knowledge of his contract with the property owners. Appellant urges this court to find that the requirement of knowledge of the existence of the contract be eliminated in a situation such as the present one."

The California Supreme Court as recently as 1960 in *Fifield Manor* v. *Finston,* 54 Cal.2d 632 [7 Cal.Rptr. 377, 354 P.2d 1073, 78 A.L.R.2d 813], has refused to allow recovery under such circumstances. In that case plaintiff had a life-care contract with one Ross, obligating plaintiff to furnish him with medical care. Ross suffered personal injuries due to defendant's negligence (and later died); plaintiff's outlay for medical care was $6,250, which it sought to recover from defendant. The Supreme Court (per Justice Dooling), denying recovery, recognized a rule of liability for an *intentional* interference with a contract, but stated (on p. 636) : ". . . [T]he courts have quite consistently refused to recognize a cause of action based on negligent, as opposed to intentional, conduct which interferes with the performance of a contract between third parties or renders its performance more expensive or burdensome."

The rule has been criticized. Justice Dooling's opinion in *Fifield Manor* cites Prosser on Torts (2d ed.) pages 723, 729, 732-733. That author states (on p. 733) : "[I]t seems . . . likely that the courts are deliberately refusing to protect any contract against negligence, influenced by fear of an undue burden upon freedom of action, the relative severity of the penalty which may be imposed upon mere negligence, the possibility of collusive claims and increased litigation, and the difficulty of apportioning damages."

And Dean Prosser then observes: "If this is true, the question may at least be raised whether such a policy is not too narrow, and whether, as in the somewhat analogous case of the liability of the contractor himself to third parties, the law may not be expected to move in the future in the direction of recovery by those whose damages are foreseeable by the actor.

"There is actually, however, very little looking even vaguely in this direction."

Plaintiff argues that *Fifield Manor* can be distinguished. He states: "There was [here] no negligent interference with the contract relation." Plaintiff's meaning is unclear to us. Alleged interference by the city with the broker's contractual right to a commission is clearly pleaded. There is, however, a circumstance in *Fifield Manor,* not present here, which made the result reached unquestionably a more equitable one. There the tortfeasor would have been liable to Ross's estate for these medical expenses (see Civ. Code, § 956, then in effect, now in Prob. Code, § 573) and to have permitted *Fifield Manor* to recover would have been to make the tortfeasor liable for double damages. (1 Harper & James, The Law of Torts, § 6.10, p. 506.)

The *Fifield Manor* decision, however, did not rest upon this inequity. It broadly states the rule that there is no liability for a negligent interference with the performance of contracts between third persons. We are bound by that decision. "It is not for us to inquire what the law ought to be when the Supreme Court has emphatically informed us what the law is." (*Orange County Water Dist.* v. *City of Riverside,* 173 Cal.App.2d 137, 165 [343 P.2d 450].)

We are, moreover, far from being convinced that, in actions of the type before us, the policy rule should be changed. Although a denial of liability for tortious interference with contractual rights is sometimes placed upon the ground that the injury is too "remote," or "indirect," "terms commonly used to denote lack of proximate causation" (see 23 Cal.L.Rev. p. 421), the question really to be answered is one of legal duty. In extending or refusing to extend the doctrine of negligent interference courts are really exercising their task of delimiting a duty of care, a task which frequently arises in accidents involving some unusual relationship between plaintiff and defendant. This is a matter of a fixing of the law's policy. Criteria, rather than rules, have emerged as guidelines in the determination of the

existence of the duty of care (without which no tort liability exists) in recent California Supreme Court cases (*Richards* v. *Stanley*, 43 Cal.2d 60, 63 [271 P.2d 23]; *Biakanja* v. *Irving*, 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R. 1358]; *Amaya* v. *Home Ice, Fuel & Supply Co.*, 59 Cal.2d 295 [29 Cal.Rptr. 33, 379 P.2d 513]), and this court has had occasion to apply them in *Raymond* v. *Paradise Unified School Dist.*, 218 Cal. App.2d 1 [31 Cal.Rptr. 847]. None of these cases involved negligent interference with contracts but, as suggested above, policy-fixing criteria there employed to determine legal duty are helpful in trying to solve the problem presented in this case.

The *Amaya* case, *supra* (dealing with the problem of liability for injury without impact), points to the confusion which ''has been engendered ... by a misplaced reliance on the 'foreseeability' formula.[1] ▮ It is not enough to say that duty has often been defined in terms of 'foreseeability,' that reasonable minds might differ as to whether the injury in the present case was 'foreseeable'[2] ... '[*T*]*here are many situations involving foreseeable risks where there is no duty.*' ...''

▮ And the court states ( on p. 309) : '' 'Foreseeability of risk ... carries only an illusion of certainty in defining the consequences for which the defendant will be liable.' (Prosser, *Palsgraf Revisited* (1953) 52 Mich L. Rev. 1, 19.) ... There is a legal duty on any given set of facts *only if the court or the Legislature says there is a duty.* ... The inquiry, then, should be concentrated on the various factors which are incorporated in the court's conclusion that on the relevant set of facts there is or is not a 'duty.' ''

▮ Some of these factors are enumerated by the court in *Amaya*. These and others suggested by textwriters (Prosser on Torts (2d ed.) p. 182; Green, Judge and Jury, 97 et seq.) are encapsulated by Justice Friedman of this court in *Raymond* v. *Paradise Unified School Dist.*, *supra*, (218 Cal. App.2d 1, 8) :

''. . . The social utility of the activity out of which the injury arises, compared with the risks involved in its conduct; the kind of person with whom the actor is dealing; the workability of a rule of care, especially in terms of the

---

[1]The foreseeability formula is a heritage from Justice Cardozo in *Palsgraf* v. *Long Island Railroad Co.*, 248 N.Y. 339 [162 N.E. 99, 59 A.L.R. 1253].

[2]Since ''hindsight is always 20-20.''

parties' relative ability to adopt practical means of preventing injury; the relative ability of the parties to bear the financial burden of injury and the availability of means by which the loss may be shifted or spread; the body of statutes and judicial precedents which color the parties' relationship; the prophylactic effect of a rule of liability; in the case of a public agency defendant, the extent of its powers, the role imposed upon it by law and the limitations imposed upon it by budget; and finally, the moral imperatives which judges share with their fellow citizens—such are the factors which play a role in the determination of duty.''

When we apply these factors to the case at bench, we experience grave misgivings as to the doors courts might be opening by creating a new rule of liability; doubts as to the workability of a rule of care, particularly with a public agency defendant involved.

We have no reason to believe and, of course, do not suggest, the existence of collusion in the case at bench but certainly the case is of a type where fraudulent claims might easily be spawned. The defendant, being a complete stranger to the transactions between the plaintiff and third parties, would be at a distinct disadvantage in attempting to investigate and verify the claim. For example (and to use the instant case for illustration), how can defendant city know or find out that its negligent act was the reason and not just the legal excuse of the buyer for cancellation of the purchase of the orchard? We consider here a policy rule which if adopted will have general application to a whole class of cases; not with a situation where liability or nonliability can be made to depend upon the factual circumstances of each case as they arise. In this case, clear and convincing proof of plaintiff's loss and defendants' negligence may be possible. But if we adopt a rule of liability for negligent interference (even though its application be limited to contracts as nearly executed as this one was with wholly executory contracts excluded)[3] do we not possibly open a Pandora's box of imaginative claims to be accepted for litigation?

---

[3]Under the facts alleged in this case plaintiff's performance had been completed and the contract had become completely executed excepting for the closing of the escrow resulting in the payment of the purchase price (and commission) and the passage of title. If a rule of liability for the interference of contracts were to be adopted limited to rights thus nearly choate the problem of court administration (i.e., possibility of fraudulent claims) would be materially eased or ameliorated.

Textwriters, as will be noted below, have been critical of the possibility of fraudulent claims as a decisive factor upon which to base denial of liability; and the question of policy may be a closer one than the statement just made asserts or implies. If so, it is still one which, as we have asserted above, cannot and should not be asserted at this appellate level. Clearly involved, as appellant's brief seems to concede, is a change of judicial policy and our Supreme Court in the *Fifield Manor* case and earlier cases cited therein has thus far refused to make this change.

In the *Amaya* case a four-to-three majority of the court held that the legal duty of care should not be extended to impose liability predicated on fright or nervous shock (with consequent bodily injury) induced solely by plaintiff's apprehension of negligently caused danger or injury to a third person—even though the plaintiff be a mother and the fear be for her child. In discussing the "Administrative Factor," the court in *Amaya* stated (on pp. 310-311): "Justice . . . exists only when it can be effectively administered" and it added "to impose liability would 'open the way to fraudulent claims, and enter a field that has no sensible or just stopping point.'" Justice Schauer's majority opinion goes on to state that "[i]t has become almost trite for legal writers to deprecate such reasoning; and we have not hesitated to reject it when we deemed that the problem of proof could be solved and the scope of liability could be delineated. [Citation.] But is this necessarily true of the case at bench?" The answer to that question was the principal basis of the split of the court as applied to the facts there involved.

The majority opinion, in discussion of socioeconomic and moral factors also states (on p. 315): "There is good sense in the conclusion of the Wisconsin court that 'the liability imposed by such a doctrine is wholly out of proportion to the culpability of the negligent tort-feasor.' (*Waube* v. *Warrington* (1953) *supra*, 216 Wis. 603 [258 N.W. 497, 501 [2-4]].)"

We deem these policy considerations to be strongly suggested here.

The judgment is affirmed.

Schottky, J., and Friedman, J., concurred