[Civ. No. 13027. Third Dist. Feb. 4, 1974.]

THOMAS G. BANVILLE et al., Plaintiffs and Appellants, v.
WILLIAM D. SCHMIDT et al.,
Defendants, Cross-complainants and Respondents;
TOM KIERNAN COMPANY REALTORS, INC.,
Defendant, Cross-complainant and Appellant.

**COUNSEL**

Gualco, Hummel & Gualco and Allan Melikian for Plaintiffs and Appellants.

McConnell, Backus & Carson, Malcolm L. McConnell and Robert Hoffman for Defendant, Cross-complainant and Appellant.

Dahl, Hefner, Stark, Marois & James, Theodore M. Marois, Jr., and Max H. Hoseit for Defendants, Cross-complainants and Respondents.

**OPINION**

JANES, J. — Plaintiffs Thomas G. Banville and Margaret J. Banville brought an action for rescission of a real estate sale and for damages for negligence, fraud, and misrepresentation. After a nonjury trial, judgment was entered as follows:

(1) For plaintiffs and against defendants William D. Schmidt (Schmidt) and Tom Kiernan Realtors, Inc. (Kiernan Company) in the amount of $12,360, and against Schmidt for an additional $2,000 in punitive damages, on plaintiffs' complaint.

(2) For defendant First American Title Company (First American) and against plaintiffs, on plaintiffs' complaint.

(3) For Kiernan Company and against Schmidt on Kiernan Company's cross-complaint for indemnity.

(4) For First American and against Schmidt on Schmidt's cross-complaint against First American.

(5) For Schmidt and Kiernan Company and against First American on First American's cross-complaint.

Plaintiffs appeal from that portion of the judgment entered in favor of First American and against plaintiffs. Kiernan Company appeals from the judgment in favor of plaintiffs and against Kiernan Company, and also from an order (treated as a judgment) sustaining, without leave to amend, the demurrer of cross-defendant First American to the second cause of action of Kiernan Company's cross-complaint against First American.

### SUMMARY OF THE FACTS

In 1961 plaintiffs purchased a lot at Tahoe Paradise in El Dorado County (Tahoe property). In 1965 they began construction of a cabin, and by 1967 had expended in excess of $15,000 upon the cabin shell and improvements. Although the cabin had not yet been completed, in June of 1967 plaintiffs listed the property for sale with Kiernan Company through Ray Collins, Kiernan Company's manager at the South Lake Tahoe office. The asking price was $14,950.

On July 11, 1967, defendant Schmidt made an offer on the Tahoe property through Kiernan Company. Schmidt offered a note for $2,600 secured by a second deed of trust on a duplex in North Sacramento and a note for $12,000 secured by a first deed of trust on property near Elverta (Elverta property) in Sacramento County. Plaintiffs were advised by Kiernan Company to look at both properties. Schmidt represented to Ray Collins of Kiernan Company that the Elverta property had an appraised value of $18,000; that the makers of the note were Del J. Fullmer and Erika M. Fullmer (Fullmers); and that Fullmer was a building contractor and a financially substantial individual. Kiernan Company passed this information on to plaintiffs without investigating the value of the Elverta property or the financial condition of Fullmer.

Plaintiffs could not locate the Elverta property but found the approximate neighborhood and looked at what they believed to be the Elverta property. Mrs. Banville and her mother looked at the North Sacramento duplex. Plaintiffs rejected the $2,600 note and second deed of trust on the North Sacramento duplex as not sufficiently protected by the property; they suggested to Kiernan Company that they would take a $14,000 note from Schmidt secured by the Tahoe property. Ray Collins of Kiernan Company thought this would not be acceptable to Schmidt.

On July 20, 1967, after some further negotiations, plaintiffs agreed to sell the Tahoe property for $2,000 in cash and an assignment of the

$12,000 note and deed of trust on the Elverta property. Although plaintiffs were not told that Collins had seen the Elverta property or that Collins knew Fullmer (the maker of the note) personally, they relied upon the representations that Fullmer was financially responsible and that since the Elverta property was appraised at $18,000 it was certainly adequate security for the $12,000 note—in Collins' words, "a good transaction."

First American handled the escrow of the $2,000 down payment and the assignment from Schmidt to plaintiffs of the note and deed of trust on the Elverta property. On August 15, 1967, plaintiffs signed escrow instructions at First American. *Also on August 15,* the Fullmers recorded a deed conveying the Elverta property back to Schmidt. At no time did Collins, Kiernan Company, Schmidt, or First American advise plaintiffs of the August 15 deed from the Fullmers to Schmidt.

On August 21, plaintiffs' Tahoe property was conveyed to Schmidt, and Schmidt's assignment of the Fullmer deed of trust was contemporaneously recorded. Also on August 21, First American issued to plaintiffs a First American policy of title insurance, insuring plaintiffs that title to the Elverta property was vested in the Fullmers subject to a deed of trust securing Fullmers' note to Schmidt in the amount of $12,000, which deed of trust was assigned to plaintiffs.

In February 1968, when the first payment came due on the $12,000 note, plaintiffs learned for the first time that the Fullmers had deeded the Elverta property back to Mr. and Mrs. Schmidt.[1] The Schmidts attempted to deed the Elverta property to plaintiffs by a deed dated September 19, 1968. Plaintiffs refused to accept the deed.

# I

## THE KIERNAN COMPANY APPEALS

### *The Judgment in Favor of Plaintiffs*

The trial court found, inter alia, that the actual value of the Elverta property "during the transaction" was $7,300 and the value of the Tahoe property was $14,000. The court further found that Schmidt (who has not appealed) made representations to Kiernan Company, including a repre-

---

[1]During the early part of July 1967, Fullmer (having thus far made no payment on his obligation) had called Schmidt to tell him that he wanted to deed the Elverta property back to Schmidt because of his (Fullmer's) shaky financial condition. Schmidt, a real estate broker, told Fullmer to "hold up"; that he would try to sell the property for Fullmer. When Fullmer heard nothing more from him, he recorded the deed conveying the property back to Schmidt. The deed was mailed to Schmidt by the county recorder on September 7, 1967.

sentation that the fair market value of the Elverta property was in excess of $12,000; and that Schmidt concealed from Kiernan Company the fact of Fullmer's financial instability. It was further found that Kiernan Company was the agent of plaintiffs and had a fiduciary duty to plaintiffs while handling the disposal of the Tahoe property, and that without making any investigation on those subjects, but relying completely upon the information given by Schmidt, Kiernan Company represented to plaintiffs that "12,000.00 was a safe figure"; that Fullmer was "a financially substantial individual"; and that the proposed transaction with Schmidt "was a good deal." The court then found that "[i]n entering into said agreement the plaintiffs relied upon the representations made by KIERNAN COMPANY and COLLINS."

In its conclusions of law, the trial court determined that "[t]he defendant SCHMIDT intentionally and deliberately misrepresented to the plaintiffs and misrepresented to the KIERNAN COMPANY and/or its agents or representatives the true value of the Elverta Property, the financial condition of DEL J. FULLMER, and the fact that DEL J. FULLMER was desirous of deeding the Elverta Property back to the defendant SCHMIDT."

It further concluded that "[t]he defendant KIERNAN COMPANY was guilty of negligent misrepresentation in advising the plaintiffs that FULLMER appeared reliable and by advising plaintiffs as to the value of the property without making any independent effort to ascertain the actual value of the said property or the financial condition of FULLMER. The defendant KIERNAN COMPANY was negligent in not advising the plaintiffs of the incidence of a purchase money deed of trust."

■ Kiernan Company's contention that there is no reasonable evidence to support the finding that plaintiffs justifiably relied on Kiernan Company's representations is without merit. ■ "When a finding of fact is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the findings of fact." (*Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 784 [59 Cal.Rptr. 141, 427 P.2d 805]; see also, *Primm* v. *Primm* (1956) 46 Cal.2d 690, 693 [299 P.2d 231].) ■ Plaintiffs had a number of conversations with Collins about the value of the Elverta property and the financial responsibility of Fullmer. Collins displayed no misgivings about his repeated representation that the property was worth $18,000 and therefore adequate security for the $12,000 note or his representation that it seemed Fullmer was a man of substance. Plaintiffs testified that they relied

on Collins' representations. There is substantial evidence to support the trial court's finding.

Kiernan Company contends that "[t]here was no reasonable evidence that Kiernan Company's not advising the plaintiffs of the incidence of a purchase money deed of trust was the proximate cause of any damages suffered by plaintiffs." It is true that in its conclusions of law the court states: "The defendant KIERNAN COMPANY was negligent in not advising the plaintiffs of the incidence of a purchase money deed of trust." However, at no point does the court find or conclude that this negligence was the proximate cause of damages to plaintiffs. Rather, the court in effect negates such a conclusion in Finding of Fact No. 19: "The deed of trust on the Elverta Property was a purchase money deed of trust and KIERNAN COMPANY and COLLINS at no time advised the plaintiffs of the incidence of a purchase money deed of trust. However, plaintiffs were aware that their only recourse was to take over the property in the event of default by FULLMER."

Plaintiffs did not wish to exchange property. They were dealing for money, i.e., the $2,000 cash down payment and the $12,000 promissory note (secured by a deed of trust) to be paid in yearly installments of $1,500 or more plus interest. Under the circumstances, the court could determine that Kiernan Company was negligent in not advising plaintiffs of the incidence of a purchase money deed of trust. Plaintiffs were not damaged by that negligence, however, because they were aware that if there was a default on the note the only recourse was to the Elverta property. Plaintiffs *were* damaged by Kiernan Company's negligent misrepresentations of the value of the Elverta property and of Fullmer's financial condition. The trial court's findings as to misrepresentations and reliance, and the judgment in favor of plaintiffs are amply supported by the evidence we have summarized.

### The Order Sustaining First American's Demurrer to Kiernan Company's Cross-complaint

Kiernan Company contends it was error for the trial court to sustain without leave to amend the demurrer to the cross-complaint of Kiernan Company against First American. In its cross-complaint Kiernan Company alleged that First American's negligence in showing the title to the Elverta property vested in the Fullmers was in effect a superseding cause of any damage incurred by plaintiffs and that if Kiernan Company is to be held liable to plaintiffs, First American should be required to indemnify Kiernan Company.

No contractual relationship existed between Kiernan Company and

First American. Kiernan Company argues, however, that whether a party who negligently performs a contract will be held liable for damages to a third person not in privity is a matter of policy and involves the balancing of various factors. In *Biakania* v. *Irving* (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358], relied upon by Kiernan Company, the court stated at page 650: "The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm."

In the *Biakanja* case, a notary public who prepared a will which was invalid because he negligently failed to have it properly attested was held liable to the named beneficiary although there was no privity of contract between them. There, however, the "end and aim" of the transaction was to provide for the passing of the estate to the plaintiff. We do not have that situation here. (See generally, 2 Miller & Starr, Current Law of Cal. Real Estate, § 252, p. 307 et seq.) The "end and aim" of the escrow and title insurance was not to protect Kiernan Company from the consequences of its negligent misrepresentations. In the case at bench, Kiernan Company, held liable to plaintiffs for negligent misrepresentations, seeks to "shift" its responsibility to First American, contending that "but for" the negligence of First American a correct vesting of title would have been disclosed, whereupon the transaction would not have been consummated, plaintiffs would not have been damaged, and plaintiffs would not have sought damages from Kiernan Company. Not under this argument, nor under any advanced by Kiernan Company, is it suggested that the conduct upon which Kiernan Company's liability to plaintiffs is predicated (i.e., negligent misrepresentations) was in any way done in reliance upon any information furnished by First American. The trial court properly sustained the demurrer to the cross-complaint without leave to amend.

## II

### PLAINTIFFS' APPEAL

By the fourth cause of action of their complaint, plaintiffs sought damages against First American, based on tort, for the title company's alleged negligence in failing to discover the recordation, on August 15, 1967, of the Fullmer deed conveying the Elverta property back to Schmidt. We summarize plaintiffs' allegations: On August 21, 1967, for a valuable

consideration, First American issued and delivered to plaintiffs a title insurance policy insuring plaintiffs in a sum not exceeding $12,000 against loss in their acceptance of the Schmidt assignment of the promissory note and deed of trust secured by the Elverta property; the title policy showed, at its date of issuance, that the Elverta property stood in the name of Del J. Fullmer and Erika M. Fuller, with a deed of trust to Schmidt (and his wife) as beneficiaries, whereas in fact, on August 15, 1967, and prior to issuance of the policy, the Fullmers had deeded the property back to the Schmidts, by a conveyance recorded August 15, 1967; that First American "knew or should have known," by reason of recordation of the Fuller-Schmidt deed, that the obligation of the Fullmers under the promissory note was extinguished; and that if plaintiffs had been aware of the foregoing they would not have proceeded with the sale of their El Dorado property. It is further alleged that "the failure on the part of . . . First American to discover the recording" of the Fullmer-Schmidt deed "was due to negligence on the part of [First American]" and that plaintiffs were damaged as a direct and proximate result of First American's negligence.[2]

After trial, the court found that in handling the escrow and issuing its policy of title insurance to plaintiffs, First American "failed in the regular course of business to note the deed conveying the Elverta Property to the SCHMIDTS by FULLMER on August 15, 1967." As a conclusion of law, it determined that "[t]he defendant FIRST AMERICAN TITLE COMPANY was negligent in its failure to ascertain the status of the title of the Elverta Property as it existed on August 15, 1967, but that said negligence was not a proximate cause of the damage sustained by plaintiffs."

In their attack upon the judgment favoring First American, plaintiffs rely upon the court's determination that First American was negligent in not ascertaining the true status of the Elverta Property at the time of issuance of the title insurance policy, but they dispute the conclusion that the title company's negligence was not a proximate cause of plaintiffs' damage. They contend that First American's negligence must, as a matter of law, be deemed a proximate cause of the damage sustained by them. First American, on the other hand, seeks to uphold the judgment in its favor as a correct application of the law to the facts found.

Preliminarily, First American contends that there was no finding that it was negligent, pointing out that the only finding of fact concerning First American was to the effect that in handling the escrow and issuing its title

---

[2]Although a copy of the First American title policy was attached to an exhibit to plaintiffs' complaint, and appropriately incorporated by reference therein, plaintiffs, for reasons unexplained, did not plead a contract cause of action against First American.

102

policy First American "failed in the regular course of business to note the deed conveying the Elverta property to the Schmidts by Fullmer on August 15, 1967." It then argues that the quoted finding does not support the conclusion of law that "[First American] was negligent in its failure to ascertain the status of title of the Elverta property as it existed on August 15, 1967." When read in their entirety, however, the implication of the findings and conclusions is clear. Moreover, whether considered as a finding or (as denominated) a conclusion of law, no attempt was made by First American to request a special finding or otherwise to bring to the attention of the trial court any omission or ambiguity in the trial court's determination of First American's negligence. (Code Civ. Proc., § 634; see 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, §§ 339-343, pp. 3140-3145.)

The main thrust of First American's argument, however, is that it owed no duty to search title; that there was no evidence that it undertook to search title to the Elverta property for the benefit of anyone; that it acted in the transaction not as an *abstractor* but as an *insurer;* and that it was requested only to issue a policy of title insurance, which it did. Its liability, if any—the argument runs—could only be founded in contract on the title policy (breach of which is not here alleged as a ground of recovery), and since it owed no one a duty to carefully search the title of the Elverta property it cannot be held liable on the basis of negligence to one to whom or for whose benefit the title insurance policy was furnished, or at all.

First American explains and distinguishes at length the relative responsibilities of a title company in its abstracting activities[3] and its position as insurer under a policy of title insurance. In support of its contention that it cannot here be charged with negligence since it was under no duty to search title, it relies heavily upon the emphasized paragraph in the following quotation from the leading text, Miller & Starr, Current Law of California Real Estate (1968):

"An insurer failing to note and except a recorded lien or other defect in the title is liable for a breach of the insurance contract and may also be liable for the negligent performance of its duties as an abstractor. Thus, in determining an insurer's potential liability for negligence, distinction

[3]In its brief, First American cites *Hawkins* v. *Oakland Title Ins. & Guar. Co.* (1958) 165 Cal.App.2d 116 [331 P.2d 742], paraphrasing (we quote from the brief) the following: "The essential elements of a cause of action against an abstractor for the negligent performance of its duty, are (1) an undertaking to search title (i.e., duty), (2) failure to exercise reasonable care in the searching and reporting of title, (3) justifiable reliance, and (4) resulting harm." As we will point out, *Hawkins* contains other implications relevant to the case at bench.

must be drawn between its function *as an insurer* and its function *as an abstractor*.

*"In issuing a policy of title insurance, an insurer is not representing that there are no other defects in the title except as noted. An insurer, if it wishes, can intentionally and deliberately fail to note a specific lien on, or other interest in, the property and can elect to assume the risk of losses to the insured resulting from the omitted item.*

"However, when a purchaser or lienor engages the services of the title company to determine whether the title is marketable or to determine the priority of a lien, he is hiring an expert abstractor employed by the title company to search and report on the public records. In doing so, the party has a right to expect the abstractor to exercise the skill, care and diligence of a professional and to accurately report the condition of the records.

"The party has a right to rely on the expertise of the abstractor and the company and on the accuracy of the report. A purchaser or lienor relying on a report of a title company that negligently fails to report a recorded defect affecting the title or lien can recover all damages proximately caused by the abstractor's negligence. On the other hand, where he did not rely on the title company's report, damages cannot be recovered even though the report was negligently prepared. . . ." (Fns. omitted; italics added.) (*Id.,* Vol. 2, § 252, in relevant part, pp. 307-308.)

Footnoted to the emphasized portion of the text upon which First American relies are the cases of *Sala* v. *Security Title Ins. & Guar. Co.* (1938) 27 Cal.App.2d 693 [81 P.2d 578] and *Hawkins* v. *Oakland Title Ins. & Guar. Co.* (1958) 165 Cal.App.2d 116 [331 P.2d 742].

In *Sala,* an action on a policy of title insurance, it was conceded that the title insurance company intentionally ignored a lis pendens relating to an action to rescind a deed for failure of consideration—an action which the *Sala* court found, in the circumstances, did not properly lie.[4] The court held that "[t]he title company had the right to include or omit a reference to the *lis pendens* in the insurance policy as it chose, and by no process of logical reasoning, in the light of the record, can any causal connection be established between such omission and the loss of the hereinbefore described property by [plaintiffs]." (27 Cal.App.2d at pp. 702-703.) Plaintiffs, therefore, were in no position "to complain because the insurance

---

[4]The opinion in *Sala* emphasized that the failure of the title insurance policy to mention the lis pendens was "of no consequence," and stated that "there is abundant authority to support [the title company's] contention that the record of the *lis pendens* did not at any time constitute a defect of the title to the property." (27 Cal.App.2d at pp. 701-702.)

policy did not contain something which the insurance company in the conduct of its business and in its best judgment saw fit to omit." (*Id.,* p. 702.)

In *Hawkins,* the court followed *J. H. Trisdale, Inc.* v. *Shasta etc. Title Co.* (1956) 146 Cal.App.2d 831 [304 P.2d 832], which the *Hawkins* court interpreted as permitting a cause of action against a title insurer for negligence in searching records. The opinion in *Hawkins*—a pleading case—points out that the complaint there did not clearly indicate whether plaintiffs were attempting to plead a tort cause of action based on defendant title company's negligence in searching title. In reversing the trial court's judgment based on a demurrer sustained without leave to amend, the *Hawkins* court remarked, albeit by dictum, that "[p]erhaps plaintiffs would be entitled to recover had they alleged that defendant undertook to search the title for their benefit, and negligently performed this undertaking or negligently reported the results of the investigation incorrectly." (165 Cal. App.2d at p. 127.)

*Hawkins* also recognized and approved as "a proper statement of the rule" the principles set forth in section 552 of the Restatement of Torts. (*Id.,* p. 126.) Section 552 of the Restatement provides: " 'One who in the course of his business or profession supplies information for the guidance of others in their business transactions is subject to liability for harm caused to them by their reliance upon the information if (a) he fails to exercise that care and competence in obtaining and communicating the information which its recipient is justified in expecting, and (b) the harm is suffered (i) by the person or one of the class of persons for whose guidance the information was supplied, and (ii) because of his justifiable reliance upon it in a transaction in which it was intended to influence his conduct or in a transaction substantially identical therewith.' " (P. 122.)

In their comment to section 552, the authors of the Restatement say: " '. . . f. *Information supplied directly and indirectly.* The person for whose guidance the information is supplied is often the person who has employed the supplier to furnish it, in which case, if it is supplied for a consideration paid by such person, he has at his election either a right of action under the rule stated in this Section or a right of action upon the contract under which the information is supplied.' " (Original italics.) (P. 126.)

In the circumstances of the present case, we are not persuaded that First American's distinction between the abstracting function and its function as an insurer of titles is determinative of the issue. Rather, the situation at bench meets the tests of the Restatement. In the light of modern real estate and title insurance practices, as well as under the authorities we have re-

viewed, an incorrect statement as to the vesting of title is hardly (in the terminology of the *Sala* case) "something which the insurance company in the conduct of its business and in its best judgment" would see fit to make. (See Cal. Real Estate Sales Transactions, ch. 17, Title Insurance (Cont.Ed.Bar 1967) §§ 17.8-17.9, pp. 611-612, citing the *Hawkins* case.) Here, on August 21, 1967, First American issued to plaintiffs a policy of title insurance[5] insuring that title to the Elverta property was vested in the Fullmers, effective "August 21, 1967 at 3:12 P.M.," subject to a deed of trust securing the Fullmers' note to Schmidt in the amount of $12,000, which deed of trust was assigned to plaintiffs. The title insurance policy was thus issued to insure plaintiffs against the very loss which they have suffered.

The First American policy acknowledges receipt of a premium in the amount of $113.60, in consideration of which plaintiffs (named therein as the "Insured") were assured, upon penalty of payment of the sum of $12,000 to them by First American, that title *was* so vested at the effective time stated by their policy, and that the Fullmers' deed of trust was a first lien on the Elverta property. No other relevant exceptions were noted in the policy.

Of significance to the controversy here, the policy recites that the premium of $113.60 was imposed as the "Total Fee for *Title Search, Examination* and Title Insurance." (Italics added.) As plaintiffs argue: "Taking into consideration [First American's] type of business, duties that arise from their business, title insurance policy issued on the transaction, and the escrow instructions, which are in evidence in this case, it is inconceivable to conclude that [First American] did not or should not have foreseen the possible transfer of the Elverta Property from FULLMER back to SCHMIDT. The facts are uncontroverted as to what transpired; that the transfer from FULLMER to SCHMIDT was duly recorded in the Sacramento County Recorder's office; and that [First American] failed in its regular course of business to discover the deed conveying the Elverta Property back to SCHMIDT by FULLMER on August 15, 1967. . . . It is . . . clear that a portion of the total fee of $113.60 is attributable to a title search and examination. In other words, FIRST AMERICAN received a fee for a title search and examination, and the beneficiaries of said title search and examination, as stated in the insurance policy itself, are the [plaintiffs]. It, therefore, appears unconscionable to say that FIRST AMERICAN did not owe a

---

[5]The policy is written on the California Land Title Association's "Standard Coverage Policy Form," and insures, inter alia, against loss or damage which the insured may suffer by reason of "Unmarketability of such title."

duty to the [plaintiffs] to reasonably and carefully perform their search and examination." (See, in addition to authorities cited above, *Northwestern Title Security Co.* v. *Flack* (1970) 6 Cal.App.3d 134, 146 [85 Cal.Rptr. 693]; *Viotti* v. *Giomi* (1964) 230 Cal.App.2d 730, 739 [41 Cal.Rptr. 345].)

First American also had a duty to plaintiffs as an escrow holder. Both the seller's and buyer's escrow instructions furnished to First American conditioned closing of the escrow on the Elverta property upon issuance of a title insurance policy showing title vested in the Fullmers, subject to the Schmidt deed of trust and its assignment to plaintiffs. Although First American did issue a policy showing title vested in the Fullmers, the misleading nature of the document does not meet the degree of skill and care required—for breach of which the escrow holder may be held liable in tort. ■ "Upon the escrow holder's breach of an instruction that it has contracted to perform or of an implied promise arising out of the agreement with the buyer or seller, the injured party acquires a cause of action for breach of contract. [Citations.] Similarly, if the escrow holder acts negligently, 'it would ordinarily be liable for any loss occasioned by its breach of duty.' " (*Amen* v. *Merced County Title Co.* (1962) 58 Cal.2d 528, 532 [25 Cal.Rptr. 65, 375 P.2d 33]; see also *Spaziani* v. *Millar* (1963) 215 Cal.App.2d 667, 682-683 [30 Cal.Rptr. 658]; *Prentice* v. *North Amer. Title Guar. Corp.* (1963) 59 Cal.2d 618, 621 [30 Cal.Rptr. 821, 381 P.2d 645]; Cal. Real Estate Sales Transactions, ch. 17, Title Insurance (Cont.Ed.Bar 1967) § 17.10, p. 612.)

■ There remains for discussion the question of proximate cause. As we have seen, the trial court found First American negligent in failing to discover the deed by the Fullmers back to the Schmidts, but found also that First American's negligence was not a proximate cause of plaintiffs' damage.

■ Ordinarily, the question of proximate cause, like those of negligence and contributory negligence, is one to be determined by the trier of fact. (See, 2 Witkin, Summary of Cal. Law (7th ed. 1960) Torts, § 283, pp. 1482-1484.) However, where only one conclusion may reasonably be drawn from the facts, the question becomes one of law. (See *Gallichotte* v. *California Mut. etc. Assn.* (1935) 4 Cal.App.2d 503, 509 [41 P.2d 349].) Stated in another way, when the facts are clear and undisputed, it is a question of law for the court to determine the legal consequences of such facts. (See *Burdette* v. *Rollefson Construction Co.* (1959) 52 Cal.2d 720, 726 [344 P.2d 307]; Rest., Torts, § 434; 2 Witkin, *ibid.,* p. 1484 and cases there cited.)

In the case at bench,. there can be no question that First American's failure to discover and report the duly recorded deed from Fullmer to Schmidt was a cause in fact of the damages sustained by plaintiffs. Resort to reason compels the inference that "but for" the negligence of First American the escrow would never have closed in a manner causing plaintiffs to lose that for which they had bargained. The acts and omissions of Schmidt and Kiernan Company were of course contributing factors leading to plaintiffs' victimization. But without First American's carelessness, the escrow would never have closed on an erroneous vesting of the title, and plaintiffs would not have been damaged.

Proximate cause includes the concept of legal cause, as well as cause in fact. The Restatement of Torts, section 431 states as follows: "The actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm."

It is an established principle that proximate cause, to be actionable, need not be the sole factor contributing to the damages sustained, but need only be *a* proximate cause of injury. As it is put by an eminent authority: "Nothing occurs in a vacuum, and the event without multiple causes is inconceivable. Existing conditions, the forces of nature, the prior acts and omissions of others, and all other surrounding circumstances invariably play their important part. From time to time the California courts have gone seeking 'the sole proximate cause' of an accident. There is, as the same courts have been forced to recognize often enough, no such thing. Neither is there any such thing as '*the* proximate cause' of an event, distinguished as a cause from all other causes. In particular, the defendant never can be absolved from liability for the mere reason that the negligence of another has contributed to the result. . . ." (38 Cal.L.Rev., pp. 379-380, William L. Prosser, *Proximate Cause in California.* [Fns. omitted].)

As Prosser notes, "[a] considerable part of the law of joint tortfeasors has been built upon the principle that responsibility may be attached to each of two or more such 'concurring' causes." (*Id.,* pp. 380-381.) In the law of joint tortfeasors, it is irrelevant whose negligence was first in time, who was the more negligent, or whether one was ordinarily and the other wantonly negligent. (See cases collected and commented on in 35 Cal. Jur.2d, § 62, pp. 560-561.) It is inconceivable on the record before us, that any act of the Schmidts, Fullmers, or Kiernan Company could be considered an intervening or superseding act, and therefore a superseding cause which would absolve First American of liability. A superseding cause

is one which cuts off the causal connection between the alleged negligence and the injury or damage complained of, and thus prevents the alleged negligence from being a proximate cause of the injury. (*Werkman* v. *Zink Corp.* (1950) 97 Cal.App.2d 418, 426-427 [218 P.2d 43].) Here the acts of Schmidt, Fullmer and Kiernan Company, even if intervening causes, could not be superseding causes because under no circumstances could they be considered unforeseeable. (See *Raymond* v. *Paradise Unified School Dist.* (1963) 218 Cal.App.2d 1, 6 [31 Cal.Rptr. 847]; *Bilyeu* v. *Standard Freight Lines* (1960) 182 Cal.App.2d 536, 542-544 [6 Cal.Rptr. 65].)

Plaintiffs bargained for $2,000 in cash plus a $12,000 note secured by a deed of trust on the Fullmer's Elverta property. The transfer of the Elverta property from the Fullmers back to the Schmidts extinguished the note, thus preventing consummation of the bargain. Apart from any expectations as to the value of the Elverta property or the financial condition of the Fullmers, the negligence of First American resulted in plaintiffs' conveying their Tahoe property for something other than that for which they had bargained. First American's negligence was, as a matter of law, a proximate cause of that damage.

The judgment in favor of plaintiffs and against Tom Kiernan Realtors, Inc. is affirmed. The judgment in favor of First American Title Company and against plaintiffs is reversed, and the trial court is directed to enter judgment in favor of plaintiffs and against First American Title Company in the sum of $12,360. The order (treated as a judgment) sustaining, without leave to amend, First American Title Company's demurrer to the second cause of action of the cross-complaint of Tom Kiernan Realtors, Inc. is affirmed.

Plaintiffs will recover their costs on appeal; First American Title Company will recover its costs in resisting the appeal of Tom Kiernan Realtors, Inc. on its cross-complaint against First American Title Company.

Richardson, P. J., and Patton, J.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.