[Civ. No. 6546. Third Dist.—April 14, 1941.]

Estate of ANNIE E. CHAMBERLAIN, Deceased. ELMER
V. CHAMBERLAIN et al., Appellants, v. C. L. PERRY,
as Executor, etc., Respondent.

O'Donnell & Bagby, C. C. McDonald and R. H. Schwab, Jr., for Appellants.

A. G. Bailey for Respondent.

TUTTLE, J.—There are two separate appeals here involved, based upon the same record. Each appellant appeals from an order settling accounts in the Estate of Annie E. Chamberlain, deceased. Objections were filed by appellants to said accounts, and after a trial of the issues thus raised, the court overruled said objections.

Annie E. Chamberlain died on October 8, 1931, at the age of 87 years. She was twice married. Both of her former husbands were deceased when the incidents which are the subject of this action arose. By her first husband she had two children, Margaret M. Chapman, one of the appellants, and C. L. Perry, respondent. Appellant Chamberlain is the child of the second marriage. Decedent inherited the ranch, upon which she lived, from her second husband, and continued to live thereon with her son, Elmer Chamberlain, for some seventeen years. On the 17th day of May, 1930, she suffered a stroke of paralysis, and upon the same day was removed to the home of respondent, where she resided until her death. Her illness left her in a very weak and helpless condition. She could not get out of bed without assistance, and required the attention of the family of respondent both night and day. She required assistance in dressing and in eating. At this time she had some $3,700 on deposit in a local bank, and was the owner of a small ranch which she inherited from her second husband. During the time she was at respondent's home, he handled all her business affairs. He took her to his own attorney for the purpose of having her will drawn; looked after her almond orchard, harvesting and selling the crops; prepared some of her checks for signature, and attended to all her banking for her. On or about July 14, 1931,—some three months before she died,—Mrs. Chamberlain signed and delivered a check for $1500 in favor of respondent, and it was cashed by him, and the money

applied to his own use. Just how this occurred is detailed by him, in answer to questions propounded by his counsel. We quote from the record:

"Q. Mr. Perry, that $1500.00—was there any discussion between you and your mother when she gave you that check as to what it was given for? A. Well, she told me; she said that she wanted to stay there and I wanted my sister to take her to Sacramento because it would be handy to doctors and she knew how to take care of her better than I and my wife did. My wife was not hardly able to take care of her, but she did not want to go over there, and my brother he couldn't take her; his wife was away part of the time, and they did not have no use for her, and nobody would take her, and she wanted to stay with me. She told me to take the crop, what was left there, for them two years. There wasn't hardly any, not so much, but she said I had earned it, and then Elmer got this money from the Bank of Esparto. Q. Bank of Yolo? A. Or, the Bank of Yolo, and they were all getting a dig at it, and I thought, well, there is no one taking care of her but me and my wife, and I had to get up from five to nine times at night to take her back and forth to the bathroom, and it took both of us most of the time, so I thought—I just mentioned it to her, and I thought she ought to give me something for taking care of her, and she said she would and I told her we would take care of her, and, if she gave us $1500.00, we would take care of her the rest of her lifetime, and she was very glad to do it, and, if she wanted to go back to the ranch, she could, but she said she would never go back to the ranch, and she wouldn't go over to my sister's, and she didn't want her to have anything."

We now turn to another incident which occurred during the time mentioned above. Perry had been, for several years, managing the almond orchard belonging to his mother. During the two years before her death, he appropriated to his own use, the gross proceeds from the sale of almonds. The amount thus received was $1453.18. Perry gave the following explanation of the matter:

"Q. Was there anything said by her, in your presence, in regard to the almond crop for 1930 and 1931? A. No, only one day I made the remark—we had prunes on our place at that time, and I said, 'The prunes are not going to amount to anything', and I said 'There are no almonds to amount

to a great deal and we won't make much', and she said, 'Well, what there is, you will make that'."

Perry testified that prior to the above conversation with his mother they had agreed upon the terms of a written contract covering this matter, under which she agreed to let him have the proceeds from the almond orchard, with the understanding that he was to care and provide for her the remainder of her life. This contract was never executed.

Upon the death of Mrs. Chamberlain, respondent Perry and appellant Chamberlain were appointed executors of her estate. During the course of probate, one of the latter's bondsmen died. Upon his failure to give another bond, Chamberlain was discharged by the court as executor, and ordered to file an account. This he did on July 7, 1938. Prior to that date executor Perry filed his second account, wherein he failed to account for the said sum of $1500 paid to him by the decedent, and also for the proceeds derived by him from the sale of said almond crop. Both appellants filed objections to said account. They set up that the transfer of $1500 was void, as being procured through undue influence exerted over the deceased by Perry. They also made the same contention with reference to the proceeds from the sale of the almond crop. They prayed that Perry be ordered by the court to account for, and charge himself with said sums. After a hearing which lasted several days, the trial court found in favor of Perry and against appellants on the issues thus raised. Appellants now separately appeal from the order made in accordance with such finding.

It must be admitted that the facts clearly show a relationship of trust and confidence existed between respondent and his mother. The latter was of the age of 86 years, and suffering not only from the infirmities of old age, but also from the result of a paralytic stroke. Her physical condition is described above. She was living in the home of respondent, under his direction and care. He managed her affairs, as detailed above. Where a fiduciary relation or a relation of trust and confidence exists between a parent and child, a presumption of undue influence arises, and the burden of proving that the transaction was the result of free volition, and was not superinduced by fraud or undue influence will rest upon respondent. (24 Am. Jur., p. 791, sec. 116; *Nobles* v. *Hutton*, 7 Cal. App. 14 [93 Pac. 289]; *Campbell* v.

*Genshlea,* 180 Cal. 213 [180 Pac. 336].) Respondent contends that the evidence upon the issue of undue influence was conflicting; and that we are therefore bound, under the familiar rule on appeal, to accept the finding of the trial court.

While it must be conceded that there is a rather strong showing made by appellants, still, in the final analysis and in spite of the presumption, if there is any substantial evidence which will justify a finding that the acts of the mother were free from undue influence, the order must be sustained upon appeal. ''A mere doubt as to whether a finding is justified by the evidence will not authorize the appellate court to set aside the finding. . . . When the evidence is conflicting, the court will presume that the evidence in support of the verdict or findings is true, and construe it and resolve every substantial conflict as favorable as possible in support thereof.'' (2 Cal. Jur., pp. 880, 881, sec. 515.) If the trial court believed the testimony of respondent—(as it must have)—that the $1500 was paid to respondent as compensation for her care and support, and that the crops were turned over to respondent by her under the same circumstances, such evidence would serve to aid in rebutting the presumption of undue influence. In 13 C. J., page 405, section 329, it is said:

''Solicitation, importunity, argument, and persuasion are not undue influence, and a contract is not to be set aside merely because the one party has used these means to obtain the consent of the other. Influence obtained by persuasion and argument or by appeals to the affections is not prohibited either in law or morals, is not obnoxious even in courts of equity, and may be termed 'due influence'. Nor is the case changed because the parties stand in confidential relations to each other.''

In 20 California Jurisprudence, page 448, section 44, it is stated:

''In disproof of any inference of imposition or undue influence, it is especially significant that the parent owed to the beneficiary a debt of gratitude for filial devotion and service and care during the parent's declining years.''

In addition, there is the fact that there is not a word of evidence in the record that the mental condition of the mother was anything but normal. We must therefore assume that

her mind was sound, and that she knew precisely what she was doing at all times. " . . . it is to be considered, as tending to rebut the presumption of undue influence, that the donor or grantor was in full possession of his mental faculties, and capable of understanding the consequences of the transaction." (20 Cal. Jur., p. 447, sec. 43.) In view of the foregoing, we are of the opinion that there is sufficient evidence to rebut the presumption of undue influence, and the court having found against the presumption, its order settling the account of respondent in respect to both transactions must be affirmed.

In the account of Elmer Chamberlain, as executor, a question arose in respect to what is known as the "Schwab" note. It appears that in 1911, Elmer borrowed $900 from Sam Schwab, and a promissory note was executed by him and his father in that amount. The father died intestate on January 15, 1932. The note had not been paid. Elmer and his mother were administrators of his estate, and they employed attorney Anderson to represent them. Shortly after their appointment as administrators a meeting was held in the office of their attorney, where the affairs of the estate were talked over between attorney Anderson, Elmer, and his mother. It was there agreed that there was not sufficient money in the estate to pay either the costs of administration, expenses of last sickness, funeral expenses, or the Schwab note, without the sale of some portion of the real property. So Mr. Anderson talked to Mr. Schwab about it, and Schwab agreed to take a new note signed by Elmer and his mother, Annie E. Chamberlain, in lieu of his claim against the estate of V. J. Chamberlain. It was also agreed at that meeting that if Annie E. Chamberlain would go on the Schwab note so as to keep it from being filed as a claim against V. J. Chamberlain's estate, Elmer would pay out of his own funds the attorney's fees, expenses of last sickness, funeral expenses, etc., which the estate could not pay. In addition to the payment of these items, Elmer was asked to waive his half interest in the separate property of his father so that his mother might have a probate homestead upon all of the real property. In the fulfilling and carrying out of this agreement Elmer paid for the cemetery lot, funeral expenses, the doctor's bill, the attorney's fees amounting to some $486. He also complied with attorney Anderson's

200

request and waived his rights in his father's separate property. The mother, on the other hand, joined with Elmer in the making of a new note to Schwab.

When *Mrs. Chamberlain died,* the note was still unpaid. The sum of $5,040.50 was due thereon. Schwab, the payee, filed a claim for said amount against her estate, and it was duly allowed and approved. Elmer, as executor, filed a petition for an order permitting the estate of his mother to borrow sufficient money to pay said note. The court granted the petition, and the claim was paid in full from the funds of the estate so borrowed. The court, however, further ordered that the distributive share of Elmer Chamberlain be charged with the amount which the estate paid to discharge said note. It is from the last mentioned portion of said order that Elmer Chamberlain prosecutes this appeal. He contends that his mother was primarily liable upon the note, and that her estate must pay it. Respondent contends that there was no consideration for said note so far as Mrs. Chamberlain was concerned, and that her estate was not obliged to pay it, because she was merely an "accommodation party", and not a maker. The parties were severally liable upon the note, and under such conditions, "each is bound to performance . . . and if one dies, the obligation may be enforced against his estate." (8 C. J., p. 66, sec. 96.) "If a note is signed by two or more makers, it will be presumed that they are co-makers, and liable as such, and not as principal and surety." (8 C. J., p. 1002, sec. 1308.) " . . . we understand the rule to be that where one signs as principal, he will be held as such, notwithstanding the creditor knew that as between the one thus signing, and the principal debtor, the former was in fact only a surety". (*California Nat. Bank* v. *Ginty,* 108 Cal. 148–150 [41 Pac. 38].) ▉ It therefore appears, in determining the capacity in which Mrs. Chamberlain signed the note, the burden rested upon respondent of proving that she was not what the instrument showed on its face—a joint and several maker—but an accommodation maker.

▉ The undisputed evidence to which we have referred above, shows that Mrs. Chamberlain did derive some benefit when she signed the note. She was entitled to succeed to a portion of the estate of her husband. When her son Elmer paid the expenses for which the estate would otherwise be

liable and forced to meet, her distributive share was correspondingly increased. Thus, she received value for signing the note. Section 3110, Civil Code, reads as follows:

"An accommodation party is one who has signed the instrument as maker, drawer, acceptor, or indorser, without receiving value therefor, and for the purpose of lending his name to some other person. Such a person is liable on the instrument to a holder for value, notwithstanding such holder at the time of taking the instrument, knew him to be only an accommodation party."

Under said section, one who has received value cannot set up the defense of accommodation maker. In 8 C. J., p. 255, section 403, it is stated:

"No consideration moving to the accommodating party is necessary to uphold accommodation paper. As already defined, accommodation paper is paper to which the accommodation party has put his name without consideration. It follows that the paper is not accommodation paper if there is a consideration accruing to the accommodating party for the signing."

In 11 C. J., S., page 297, section 742, it is said:

"On the other hand, the consideration may in reality be for value, although the purpose was to accommodate another party, and where a person lending his credit seeks to accomplish thereby legitimate objects of his own and not simply to aid the maker, the act is not for accommodation."

To the same effect: *Gardiner* v. *Holcomb*, 82 Cal. App. 342 [255 Pac. 523]; *Seth et al.* v. *Lew Hing et al.*, 125 Cal. App. 729 [14 Pac. (2d) 537, 15 Pac. (2d) 190]. The case of *Warren National Bank* v. *Suerken*, 45 Cal. App. 736 [188 Pac. 613], is directly in point. There, the court stated that the notes imported consideration, and that the burden was upon the defendant to establish the fact of want of consideration. Disposing of the contention, and holding that the defendant was an accommodation maker, the court said, at page 740:

"An accommodation maker is defined in Parsons on Notes and Bills, Section 131, as 'one who puts his name there without any consideration, with the intention of lending his credit to the accommodated party'. As stated in Randolph on Commercial Paper, second edition, section 472, the term 'without consideration' must be considered as meaning simply

'without consideration to the accommodating party directly'. Accepting this definition, can it be doubted that when the defendant here became a party to these notes it was for the direct advantage to be gained by herself and her coheirs and associates in protecting their interest in decedent's estate from the immediate enforcement of this liability against it? It was not a liability enforceable against the defendant, but it was enforceable against the property to which she was about to succeed. Any suspension or forbearance of a legal right constitutes a sufficient consideration for a note or bill. (Civ. Code, sec. 1605; *Naglee* v. *Lyman,* 14 Cal. 450.) And where heirs or assignees of an estate of a deceased person, in order to protect that estate from claims against the decedent which are enforceable against the property of the estate, obtain a renewal or extension of time on the original claim by agreeing to pay it, such renewal or extension is sufficient consideration for their promise. (*Rohrbacher* v. *Aitken,* 145 Cal. 484 [78 Pac. 1054]; *Whelan* v. *Swain,* 132 Cal. 389, [64 Pac. 560]; *Humboldt Sav. etc. Soc.* v. *Dowd,* 137 Cal. 408 [70 Pac. 274].)''

The undisputed evidence shows that the mother signed not simply to aid her son, but also to benefit herself. We therefore conclude that there was no evidence upon which to base a finding to the effect that the mother was an accommodation maker, and that the undisputed evidence shows that she was a maker, and therefore, primarily liable with her son upon the instrument. ▮ The court therefore erred in deducting from the distributive share of Elmer Chamberlain the amount paid by the estate upon said note. The contention is made by respondent that if the consideration did not come from the payee, but from the accommodation party (Elmer), the accommodation status of Mrs. Chamberlain was not affected. The cases cited by him—*Gardiner* v. *Holcomb, supra,* and *Harris* v. *Holland,* 107 Cal. App. 646 [290 Pac. 903]—do not support his contention. Neither does 11 C. J. S., 296, nor 8 C. J., 253, paragraph 398, lay down such a rule. *Some months* after the note was executed, the court, on application of Mrs. Chamberlain, set aside all the real property of her husband's estate as a homestead. This left practically nothing in the estate. Respondent contends that as the widow had the right to her homestead, irrespective of the claims against the estate, it was no benefit to her to have the claims paid by her

son. We do not see how the fact that she might, in the future, take such action, would affect the benefit which would accrue to her in the *ordinary course* of administration, and which was in contemplation of the parties when they executed the note.

In a petition for rehearing filed by respondent executor, we are asked to decide a question which was not directly presented for our consideration by either party on the appeal, but which we believe should be disposed of in the interest of all concerned and in order to prevent a multiplicity of actions. He contends that while we decided that the *whole* sum of $5,040.50 could not be charged against the distributive share of Elmer V. Chamberlain, there is still left undecided the question as to whether or not *one-half* of said amount could be so charged. He urges that the estate, having paid the *whole* of said note, is entitled to a contribution from Elmer of *one-half* of said amount, (Civ. Code, sec. 1432), and that the court *should deduct that amount from the distributive share of Elmer, and impress a lien* upon real property to be distributed to him out of the estate as security for the payment thereof.

Appellant Chamberlain, while conceding that the estate is entitled to such a contribution, contends that it was beyond the power of the court to enforce it by setting off said sum against the distributive share of Elmer V. Chamberlain and impressing a lien for the amount upon any property which may be distributed to the latter as security for the payment of the same.

We are of the opinion that appellant's contention is the correct view to be taken. It must be remembered that we are considering here only an objection to an account based upon the provisions of section 927 of the Probate Code. The matters to be shown by such account are detailed as follows in section 921 of said code:

"Whenever required by the court or a judge thereof, either upon its or his own motion or upon the application of any person interested in the estate, the executor or administrator must render and file with the clerk a verified account showing the amount of money received and expended by him, the claims filed or presented against the estate, giving the name of each claimant, the nature of the claim, when it became due or will become due, whether it was allowed or rejected

by him, or not yet acted upon, and all other matters necessary to show the condition of the estate. If he neglects or refuses to appear and render such account, after having been duly cited, an attachmcnt may be issued against him and such accounting compelled, or his letters may be revoked, or both, in the discretion of the court or judge."

That there is no provision in the Probate Code which gives the court power or authority, in settling an account, to charge the *distributive share* of an executor, administrator, heir, devisee, or legatee with a debt which any one of them may owe the estate. The jurisdiction of the court in settling a final account is defined in California Jurisprudence, 11B, pages 605, 606, 607, section 1143, as follows:

"As distinguished from the decree of distribution or for payment, which may be prayed for and made at the same time, the only function of the court in the decree of settlement is to determine what property and especially what money belonging to the estate is in the hands of the representative. . . .

By virtue of its power to settle a final account and by its decree to determine what remains to be distributed, the court, in settling an account, has jurisdiction to determine the amount of money or property of the estate that has come into the hands of the representative and to charge him therewith, adverse to his individual claims or right against the estate. . . .

Settlement on an annual or current account should be confined to the money transactions—receipts and disbursements debited and credited; the property on hand or shown is the subject of the final accounting."

It thus appears that, where, as in this matter, the executor is found to be indebted to the estate, the court has the power to charge him with the amount thereof. The matter of offsetting such indebtedness against the distributive share of a personal representative or an heir, devisee or legatee, if such power exists, is another matter, and can only be considered and adjudicated at the time when thc petition for distribution is heard. Here, no such petition had yet been filed, nor does it appear that the estate was ready for distribution. This must be true, for the reason that it cannot be definitely determined, prior to such hearing, what the distributive share of such person would be. In the case most strongly relied

upon by appellant—*Estate of Polito,* 51 Cal. App. 752 [197 Pac. 976]—the attempt to set off against his distributive share, a debt due the estate by an heir, arose upon *final distribution,* and the appeal was taken from the decree. The numerous cases cited by both parties, and relating to the right of offset *against a distributive share,* all arose from attacks made upon decrees of distribution, and not upon objections to an account. This rule does not apply, where a claim is allowed, and the estate attempts to offset against such claim, an indebtedness due the estate from the creditor, and where no attempt is made to offset an indebtedness against a *distributive share.* (*Estate of Bell,* 168 Cal. 253 [141 Pac. 1179].) We do not wish to be understood as holding that, even upon distribution, a debt due from a personal representative, or an heir, devisee or legatee, may be offset against his distributive share. We do hold, however, that the utmost power which the court possessed here was to charge the executor with the debt which the account showed was due from him to the estate. This was one-half of the amount paid by the estate in settlement of the claim.

That portion of the order appealed from which relates to the payment of the sum of $1500, and the further payment of the proceeds from the almond orchard, is affirmed, while the portion which deducts from the distributive share of appellant, Elmer V. Chamberlain, the amount paid by the estate on the promissory note, is reversed, with directions to the trial court to enter an order in conformity with this opinion.

Appellant Elmer V. Chamberlain will recover his costs on appeal. Appellant Chapman and respondent will each pay his own costs.

Pullen, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied May 14, 1941, and the following opinion then rendered:

THE COURT.— It is pointed out by respondent that Chamberlain was removed as executor by order of court on March 14, 1939, and that the note was paid April 18, 1939. He states that the right of contribution did not arise until the note was paid by the estate. We may say that the record

does not furnish the dates mentioned. This question is raised here for the first time. Assuming that the position of respondent is correct, the rule is that until the account of the executor under such circumstances is finally settled, he is, in respect to his duty to account, treated as still in office. (11B Cal. Jur., p. 528, sec. 1074.) The right of action for contribution arose prior to a settlement of the account, and the court would have the right to charge the executor with an indebtedness to the estate, if it accrued prior to the settlement of the account.

The petition for rehearing is denied.

Respondent's petition for a hearing by the Supreme Court was denied June 12, 1941.