[Civ. No. 13390. Fourth Dist., Div. Two. July 30, 1974.]

COMMON WEALTH INSURANCE SYSTEMS, INC., Plaintiff;
THOMAS J. CRIBBS et al., Plaintiffs, Cross-defendants and Appellants, v.
PAUL J. KERSTEN, Defendant, Cross-complainant and Respondent.

CARL E. DONAHUE et al., Plaintiffs and Appellants, v.
PEARSON, SCOTT AND COMPANY et al.,
Defendants and Respondents.

## COUNSEL

Baum & Fenster and Stephen M. Fenster for Plaintiffs, Cross-defendants and Appellants and for Plaintiffs and Appellants.

No appearance for Plaintiff.

Dillon, Boyd, Dougherty & Perrier, H. Morgan Dougherty, John P. Carroll, Schell & Delamer and Mark B. Pepys for Defendants, Cross-complainants and Respondents and for Defendants and Respondents.

## OPINION

**TAMURA, J.**—This is an appeal from a judgment in consolidated actions involving a $25,000 loan from defendant Paul J. Kersten to Common Wealth Insurance Systems, Inc. (Common Wealth).

The $25,000 loan was evidenced by a promissory note[1] executed by

---

[1]The promissory note provides:

"PROMISSORY NOTE

"25,000.00 March 29, 1968, 19 .

"On or before June 1, 1971, .............. ~~after date~~ and for value received, we, jointly and severally, ...... promise to pay to PAUL J. KERSTEN, a married man, as his separate property, or order at 39-580 Kersten Rd. Indio, California

Charles Wimberly, as President of Common Wealth and as an individual, and by three of the principal shareholders of Common Wealth (Thomas J. Cribbs, Carl E. Donahue and Bruce B. Betz). The loan transaction was consummated through an escrow company (Pearson, Scott and Company). Under the terms of the escrow, the note was to be secured by a pledge of shares of stock in the Santa Cruz Veneer Products Company (Santa Cruz) standing in the name of Wimberly and his wife (Peggy Wimberly). An affidavit was to be deposited in escrow as proof of such stock ownership. Two of the purported affidavits of stock ownership deposited in escrow were notarized by Joyce A. Gilbert, whose surety on her official bond was Western Surety Bond Company (Western).

The first action (Common Wealth et al. v. Kersten, superior court No. 98266) was for declaratory relief whereby Cribbs, Donahue and Betz sought an adjudication of nonliability on the note, Cribbs alleging that his purported signature on the note was a forgery and Donahue and Betz alleging that they were accommodation makers and, as such, were exonerated when one of the conditions under which the shares of Santa Cruz stock was to be pledged was modified without their knowledge and con-

---

the sum of TWENTY FIVE THOUSAND and No/100 .....................Dollars with interest from date* until paid, at the rate of .........TEN......... per cent, per annum, payable in monthly payments of interest only on unpaid principal balance,**

"Should the interest not be so paid, it shall become a part of the principal, and thereafter bear like interest as the principal. Should default be made in the payment of any installment of interest when due, the whole sum of principal and interest shall become immediately due and payable at the option of the holder of this note. Should suit be commenced or an attorney employed to enforce the payment of this note, I agree to pay such additional sum as the court may adjudge reasonable as attorney's fees in said suit. Principal and interest payable in lawful money of the United States. 'In event of payment of principal in excess of contractual arrange-***

"COMMON WEALTH INSURANCE SYSTEMS, INC.

"/ [s] Charles L. Wimberly
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
 Charles L. Wimberly, Pres. and as an individual

"/ [s] Thomas J. Cribbs by Margo Cribbs pwr atty dtd 5 Mar 68
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
 Thomas J. Cribbs—individual

"/ [s] Carl E. Donahue
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
 Carl E. Donahue—individual

"/ [s] Bruce B. Betz
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
 Bruce B. Betz—individual

"**on the first day of each month, beginning June 1, 1968, PLUS semi-annual principal payments of $4,166.67 beginning Nov. 1, 1968 and so continuing until June 1, 1971, when due in full.

"***ments, there shall be due additionally a sum equal to 90 days unaccrued interest on all amounts so prepaid.'"

sent. Kersten cross-complained for the unpaid balance due on the note ($18,833.33 at the time of trial) and for foreclosure of the collateral.

In the second action (Donahue et al. v. Pearson, Scott and Company et al., superior court No. 98416), Donahue and Betz sued the escrow company, the notary public, and the surety on her official bond for indemnity for any sums which might be awarded against them on Kersten's cross-complaint. The complaint alleged the escrow company breached their duty by accepting a modification of the terms of the stock pledge without their consent and by failing to require a proper affidavit of stock ownership of Santa Cruz. The complaint sought indemnity against the notary for negligent and fraudulent notarization of a forged affidavit of the president of Santa Cruz (Dan Whitehead).

Following a consolidated, nonjury trial, the court found in favor of defendant Kersten in the first action and in favor of the escrow company, the notary and her surety in the second action.

Viewing the evidence in the light most favorable to the parties prevailing below, as we are compelled to do on appellate review, the pertinent facts are as follows:

In March 1968 Wimberly made a written application to a loan broker for its services in obtaining a $25,000 loan for Common Wealth. Pursuant to the application, the broker arranged the Kersten loan. On March 29, 1968, a loan escrow was opened with Pearson, Scott and Company. Under the terms of the escrow agreement, the promissory note evidencing the loan was to be executed by Common Wealth (by Charles Wimberly as President) and by Wimberly, Cribbs, Donahue and Betz as individuals and was to be "additionally secured by an Assignment of Stock Certificates covering the 2/3rd interest of CHARLES L. WIMBERLY and his wife, Peggy Wimberly, in the SANTA CRUZ VENEER PRODUCTS CO., a corporation, . . ." The instructions required the borrower to deposit the following documents into escrow: "a. Sworn Affidavit of Santa Cruz Veneer Products Co., a corporation that 2/3 of Stock of said corporation stands in the names of Charles L. Wimberly and Peggy Wimberly, his wife. b. Certificates covering said 2/3 interest in said corporation Stock. c. Assignment of said Stock executed by Charles L. Wimberly and Peggy Wimberly in favor of Paul J. Kersten, a married man, as his separate property."

The escrow instructions and the promissory note purported to bear all of the required signatures. However, Cribbs' name was signed: "Thomas J. Cribbs by Margo Cribbs pwr atty dtd 5 March 68." Mrs. Cribbs denied signing the documents and Cribbs denied ever authorizing her or anyone

else to sign his name. The only power of attorney he ever gave his wife was in 1949 when he was about to go overseas on military duty.

Cribbs became acquainted with Wimberly while the two were in the Air Force. In December 1965 Cribbs bought 10,000 shares of Common Wealth stock and later acquired an additional 8,000 shares. Cribbs was on active military duty between February 1968 and September 1968 and for most of that period was stationed in Southeast Asia. While on temporary leave in June 1968 he attended an informal shareholders' meeting at which Wimberly reported that the company was in dire financial straits and needed money. On January 2, 1969, Cribbs became an employee of Common Wealth and on April 14, 1969, became its president. Although he had heard of the Kersten loan before he became president, he first became aware of his purported signature on the note on April 15, 1969. He accused Wimberly of forging his signature but Wimberly denied the accusation. He never inquired of his wife, Donahue or Betz whether any of them had signed his name to the note.

Sometime between April and July 1969, Cribbs visited the Kersten home to discuss the loan, but during the conversation he never revealed to Kersten that his signature on the note was a forgery. Cribbs paid $2,000 of a $4,000 installment then due and told the Kerstens he was attempting to get the affairs of the company straightened out and to bring the Kersten account current. On September 12, 1969, Cribbs transmitted to Kersten an interest payment on the note with a letter thanking him for his patience and stating "I am sorry I cannot bring this account up to date, but believe me it is my intention to do so as soon as it is physically possible."[2] Kersten did not learn of the forgery until Cribbs commenced the lawsuit.

---

[2]"September 12th, 1969

"Mr. Paul Kersten

R 2 Box 148

Indio, California

"Dear Mr. Kersten:

"First I want to thank you very sincerely for your patience. This has helped considerable to sooth[e] the pressures of my dilemma.

"Considerable progress has been made, but I am sure you do not recognize this because you have not received the monies rightfully due. I have not, for a moment, forgotten or discarded Common Wealth's obligation to you. It has been purely the lack of funds that has forced me to be deli[n]quent.

"Enclosed is a check for an interest payment. I am sorry I cannot bring this account up to date, but believe me it is my intention to do so as soon as it is physically possible.

On April 9, 1968, an amendment to the loan escrow instructions was executed by Kersten and Wimberly (as president of Common Wealth) whereby it was agreed that the shares of the Santa Cruz stock pledged as collateral would "remain on deposit at the Bank of America, Santa Cruz main office, in the Safe Deposit Box in the name of Dan Whitehead," instead of being delivered to Kersten. Dan Whitehead was the father of Wimberly's wife. Wimberly testified he discussed the amendment with Donahue and Betz but they denied knowledge of the amendment and testified they would not have approved it.

In order to comply with the escrow instructions pertaining to proof of stock ownership in Santa Cruz, Wimberly caused three documents to be prepared and deposited in escrow. Each document was in the following form:

### "A F F I D A V I T

"This statement is prepared for those whom it may concern. The principal assets of Santa Cruz Veneer Products Company are approximately five acres of land per legal description attached and 50,000 square feet warehouse being used as an industrial park. Company organization is as follows:

"Dan Whitehead
"President

"Charles Wimberly
"Vice President

"Peggy G. Wimberly (daughter & sole heir of Dan Whitehead)
"Sect. & Treasurer

"The three above named individuals own 100% of stock in approximately equal shares."

One of the "affidavits" purported to be signed by Whitehead, one by Wimberly and one by Wimberly's wife. The "affidavits" of Whitehead and Wimberly simply bore the notarial stamp and signature of Joyce A. Gilbert; they failed to show that the signers had "Subscribed and Sworn" to

---

"Thank you again for your patience.
"Yours very truly,
"[s] Thomas J. Cribbs
"THOMAS J. CRIBBS
"PRESIDENT"

the documents. Wimberly's wife's affidavit was subscribed and sworn to before a different notary.

According to Gilbert, the circumstances under which she notarized the two documents were as follows: While she was visiting at a friend's house, Wimberly appeared and requested notarization of two documents; Wimberly signed his own name to one and signed Whitehead's name to the other; he showed her a notarized document purporting to give him power of attorney to sign Whitehead's name; after she affixed her signature and notarial stamp to the documents she requested Wimberly to sign his name on Whitehead's "affidavit" to indicate he was signing it pursuant to a power of attorney but he refused to do so, indicating that the document was unimportant.

In a deposition received in evidence, Whitehead testified there were 17,390 shares of common stock of Santa Cruz of which he owned 15,390 and the Wimberlys each owned 1,000; he had never been requested to provide information pertaining to the stock ownership of Santa Cruz; and he never signed or authorized anyone else to sign the "affidavit" bearing his name.

Prior to trial a written stipulation was entered into by the parties wherein it was agreed that Santa Cruz and Whitehead would deliver to counsel for Mr. Kersten certificates evidencing 2,000 shares of common stock in Santa Cruz standing in the names of the Wimberlys, the certificates to be held in pledge as security for the $25,000 loan to Common Wealth, and that on delivery of the certificates Kersten's cross-complaint would be dismissed as to Santa Cruz and Whitehead. It was further stipulated that the 2,000 shares standing in the names of the Wimberlys constituted only 11.4 percent of the total outstanding stock of Santa Cruz. By the time of trial the terms of the stipulation had been satisfied and certificates for 2,000 shares of common stock of Santa Cruz were in the hands of Kersten's attorneys.

The court made detailed findings from which it concluded, inter alia: Although Cribbs' signature on the note was forged, he ratified the signature and by his conduct rendered himself liable on the note; Donahue and Betz executed the note in their individual capacities, not as accommodation makers; Kersten was entitled to foreclose on the pledged collateral and to recover any deficiency from Cribbs, Donahue and Betz, as well as Wimberly and Common Wealth; Donahue and Betz were not entitled to indemnity against the escrow company because the pledged stock was neither lost nor impaired but was in possession of Kersten at the time of trial; the fact that the stock ownership of the Wimberlys did not constitute

ownership of two-thirds of the stock of Santa Cruz did not entitle Donahue and Betz to indemnity against the escrow company because the escrow company "had no way to determine that the 2,000 shares were not two-thirds of the stock of the company"; although the escrow company was negligent in failing to examine carefully the affidavits of stock ownership, Donahue and Betz failed to prove they were damaged as a proximate result of such negligence; Donahue and Betz did not rely on the actions of the notary public and were therefore not entitled to indemnity against the notary and her surety.

Judgment was entered in accordance with the findings and conclusion. Plaintiffs Cribbs, Donahue and Betz appeal from the judgment.[3]

Plaintiffs seek reversal of the consolidated judgment in its entirety. Cribbs attacks the judgment as it pertains to his liability on the note on the ground the evidence fails to support the findings that he either ratified his forged signature or was estopped to deny its validity. Donahue and Betz urge that they were accommodation makers and were therefore exonerated from liability on the note by virtue of the modification of the terms of the pledge without their consent. Donahue and Betz attack the judgment as it relates to their right to indemnification on the ground the uncontroverted evidence established negligence of the escrow company and the notary and potential damage resulting therefrom.

## I

We shall first deal with Cribbs' contention that the evidence failed to support the findings and conclusions that he ratified his forged signature and was estopped to deny its validity.

Under the Negotiable Instruments Law, other jurisdictions were divided on the question whether a principal may ratify the forgery of his signature by his agent (see Annot., 150 A.L.R. 978, 985-986), but it has long been settled in California that where a principal-agent relationship exists, the principal may ratify his signature forged by his agent. (*Rakestraw* v. *Rodrigues*, 8 Cal.3d 67, 73-74 [104 Cal.Rptr. 57, 500 P.2d 1401]; *Navrides* v. *Zurich Ins. Co.*, 5 Cal.3d 698, 703-704 [97 Cal.Rptr. 309, 488 P.2d 637, 49 A.L.R.3d 828]; *Volandri* v. *Hlobil;* 170 Cal.App.2d 656, 659-660 [339 P.2d 218]; *Kadota Fig Assn.* v. *Case-Swayne Co.*, 73 Cal.App. 2d 815, 821 [167 P.2d 523].) However, whether a forged signature was subject to ratification in the absence of a principal-agent relationship had never been squarely decided in this state. In the early case of *California*

---

[3]The judgment also awarded Kersten $5,000 as attorney's fees against Wimberly, Donahue, Betz and Common Wealth and $1,500 exemplary damages against Wimberly.

*Bank* v. *Sayre* (1890) 85 Cal. 102 [24 P. 713], the court did observe that under certain circumstances failure to repudiate a forged signature may constitute ratification but held that under the facts of that case mere silence did not amount to a ratification. (At pp. 104-105.)

Under the common law, even in jurisdictions following the rule that a forgery cannot be ratified, a party could be estopped from denying liability on a forged instrument. (10 C.J.S., Bills and Notes, § 485, pp. 1054-1055.) This has long been the law in California. (*Crittenden* v. *McCloud,* 106 Cal.App.2d 42, 50 [234 P.2d 642]; *Merry* v. *Garibaldi,* 48 Cal.App. 2d 397, 402-403 [119 P.2d 768].)

The Uniform Commercial Code (Code), effective in California on January 1, 1965 (Stats. 1963, ch. 819, p. 1849), made substantial changes in the Negotiable Instruments Law.[4] The note in question is subject to the provisions of chapter 4 of the Commercial Paper Division of the Code and the validity of Cribbs' signature is governed by section 3404 which provides: "(1) Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it; but it operates as the signature of the unauthorized signer in favor of any person who in good faith pays the instrument or takes it for value.

"(2) Any unauthorized signature may be ratified for all purposes of this division. Such ratification does not of itself affect any rights of the person ratifying against the actual signer."[5]

The Code comment to section 3404 states that "Subsection (2) is new" and "settles the conflict which has existed in the decisions as to whether a forgery may be ratified." It states that ratification may be found from conduct as well as from express statements and although the forger is not an agent, "the ratification is governed by the same rules and principles as if he were." The comment explains the use of the phrase "or is precluded from denying it" as recognizing the principle of estoppel to deny the validity of a signature.

Although the question is one of first impression in California, we are satisfied that under Code section 3404, a forged signature may be ratified even where the forger is not the agent of the purported signer. (See *Weist* v. *First Citizens National Bank* (Pa.) 10 Lyc. 125 [3 U.C.C.Rep. 875,

---

[4]Unless otherwise indicated, all section references are to the Commercial Code.

[5]The Code defines "unauthorized signature" as one made "without actual, implied or apparent authority and includes a forgery." (§ 1201, subd. 43.)

877].) We also hold that under section 3404, a person whose signature is forged may be estopped to deny its validity.

 Cribbs does not disagree with this reading of the Code. His sole contention is that since he proved the fact of forgery, the burden was on Kersten to prove ratification or estoppel and that he failed to meet that burden by a preponderance of the evidence.[6]

Our function on appellate review, however, is limited to the question whether there is any substantial evidence, contradicted or uncontradicted, which will support the questioned finding. (*Foreman & Clark Corp.* v. *Fallon,* 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362]; *Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689].) Whether there has been ratification of a forged signature is ordinarily a question of fact. (*Gates* v. *Bank of America,* 120 Cal.App.2d 571, 576 [261 P.2d 545].) Whether one is estopped to deny the validity of a forged signature is likewise ordinarily a factual issue. (See *Crittenden* v. *McCloud, supra,* 106 Cal.App.2d 42, 50.) Existence of estoppel is generally a question for the trier of fact and the trial court's determination is binding on appeal unless the contrary conclusion is the only one to be reasonably drawn from the facts. (*Albers* v. *County of Los Angeles,* 62 Cal.2d 250, 266 [42 Cal. Rptr. 89, 398 P.2d 129]; *Bank of California* v. *Connolly,* 36 Cal.App.3d 350, 364 [111 Cal.Rptr. 468].) With the foregoing principles in mind, we consider first the sufficiency of the evidence to support the finding of ratification.

 "Ratification is the voluntary election by a person to adopt in some manner as his own an act which was purportedly done on his behalf by another person, the effect of which, as to some or all persons, is to treat the act as if originally authorized by him"; ratification may be by conduct which is inconsistent with any reasonable contention on his part other than that he intended approving and adopting the act. (*Rakestraw* v. *Rodrigues, supra,* 8 Cal.3d 67, 73.) Voluntary retention of benefits with knowledge of the unauthorized nature of the act constitutes ratification. (*Fidelity & Casualty Co.* v. *Abraham,* 70 Cal.App.2d 776, 782-783 [161 P.2d 689]; 1 Witkin, Summary of Cal. Law (8th ed.) Agency and Employment, § 129, p. 736; Rest.2d Agency, §§ 98, 99.) Acquiescence or silence may also constitute ratification. (*Ralphs* v. *Hensler,* 97 Cal. 296, 303 [32 P. 243];

---

[6]Section 3307, subdivision (1)(a) provides: "(1) Unless specifically denied in the pleadings each signature on an instrument is admitted. When the effectiveness of a signature is put in issue

"(a) The burden of establishing it is on the party claiming under the signature; . . ."

*Waldteufel* v. *Sailor*, 62 Cal.App.2d 577, 581 [144 P.2d 894]. See *Bank of America* v. *Perry*, 41 Cal.App.2d 133, 141 [106 P.2d 53]; Rest.2d Agency, *supra*, § 94.)

In *Rakestraw* v. *Rodrigues, supra*, 8 Cal.3d 67, a husband forged his wife's signature to a note and trust deed on the wife's separate property to obtain a $75,000 loan to provide capital for the operation of a supermarket owned by a corporation bearing the husband's name. The wife discovered the forgery within a few days but did nothing to disaffirm her signature until three years later when she was sued on the note. In the interim she told others she had an interest in the supermarket because her property was used as security to finance its operation; she took an active part in running the market; and she benefited financially from the operation of the supermarket. The Supreme Court held that in the circumstances, wife's failure to repudiate her signature until the business of the supermarket failed constituted ratification as a matter of law.

Although the facts of the instant case do not approach ratification "as a matter of law," there was sufficient evidence to support a finding of ratification based on acquiescence. There was evidence that after Cribbs discovered the forgery, he benefited financially from Common Wealth (whose continued survival was made possible by the Kersten loan) by drawing a salary of $1,000 per month for four or five months as corporate president and repaying to himself a $5,000 loan he had previously made to the corporation; he delayed making the forgery known in order to avoid casting suspicion on Donahue and Betz as the possible forgers, hoping that the corporation would ultimately be able to pay off the indebtedness and the forgery could be forgotten; he assured Kersten he was doing everything possible to bring the loan account current and failed to repudiate his signature until he became convinced that Common Wealth was hopelessly insolvent and could never pay off the Kersten note.

Cribbs contends there was no ratification because there was no voluntary acceptance of the benefits of the loan after knowledge of the forgery in that by the time the forgery was discovered the funds had been disbursed to the corporation and expended. In *Rakestraw* v. *Rodrigues, supra*, 8 Cal.3d 67, at page 75, the court responded to a like contention by stating: "Joyce [wife] contends that her approval of the transaction and acceptance of benefits was involuntary because at the time she discovered the forgeries she could not rescind the transaction by returning the proceeds of the loan as they had already been expended. There is no merit in this contention. Whether or not she was in a position to return the proceeds of the loan, she could have disavowed the transaction and relieved herself of potential

liability by informing Acme and Security of the forgeries. (Cal.U.Com. Code, § 3404, subd. (1).) At the time of discovery she had not ratified the transaction nor had she done anything to preclude her from asserting that the signatures were not hers. Had she then repudiated the forgeries, her failure to take action to force the corporation to make restitution of the proceeds of the loan would not have validated the forged signatures. . . .''

In addition to finding ratification, the trial court found estoppel. There was sufficient evidence to support that finding.

 "[A] person may not lull another into a false sense of security by conduct causing the latter to forebear to do something which he otherwise would have done and then take advantage of the inaction caused by his own conduct." (*Lovett* v. *Point Loma Development Corp.,* 266 Cal.App. 2d 70, 75 [71 Cal.Rptr. 709]. See Evid. Code, § 623;[7] *Tresway Aero, Inc.* v. *Superior Court,* 5 Cal.3d 431, 438 [96 Cal.Rptr. 571, 487 P.2d 1211]; *Drinnon* v. *Oliver,* 24 Cal.App.3d 571, 580 [101 Cal.Rptr. 120].) Whether this occurred is a question of fact. (*Lovett* v. *Point Loma Development Corp., supra,* 266 Cal.App.2d 70, 76.) In the present case the court found that Common Wealth was solvent during the period Cribbs was assuring Kersten he was doing everything possible to bring the loan account current and that "as a result of those contacts with Cribbs, defendant Kersten took no action against any of the parties responsible on the note." Although Cribbs did not specifically ask Kersten not to bring an action, it may be reasonably inferred that the assurances were given to induce Kersten not to do so. In his letter of September 12, 1969, Cribbs thanked Kersten for his patience. In the circumstances, there was a clear duty to disclose the forgery rather than to conceal it. (Cf. *Merry* v. *Garibaldi, supra,* 48 Cal.App.2d 397, 401.) An estoppel may be found even though the person estopped did not actually intend to mislead or to defraud the other person. (*Lovett* v. *Point Loma Development Corp., supra,* 266 Cal.App.2d 70, 76. See *Cooper* v. *Union Bank,* 9 Cal.3d 371, 383 [107 Cal.Rptr. 1, 507 P.2d 609].)

## II

 We next consider the contention of Donahue and Betz that they were exonerated from liability on the note.

Under the original escrow agreement, the pledged stock was to be de-

---

[7]Evidence Code section 623 provides: "Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it."

livered to the lender. The amendment executed by Kersten and Wimberly provided that the stock certificates were to remain in a safety deposit box in the Bank of America in Whitehead's name. Donahue and Betz contend they were accommodation makers and as such were exonerated because the amendment was made without their consent and resulted in the impairment of the collateral.[8]

"An accommodation party is one who signs the instrument in any capacity for the purpose of lending his name to another party to it." (§ 3415, subd. (1).) Whether a party was or was not an accommodation maker is ordinarily a question of fact. (*Williams* v. *Reed,* 48 Cal.2d 57, 61-63 [307 P.2d 353]; *Western H. Lbr. Co.* v. *Superior F. Mfrs., Ltd.,* 18 Cal.App.2d 287, 289-290 [63 P.2d 828].) In the case at bench the trial court found that Donahue and Betz were not accommodation makers. There was substantial evidence to support that finding. They signed the note in their individual capacities; they were among the principal stockholders of Common Wealth; and the loan was essential to the preservation of their interest in the corporation. The foregoing evidence was sufficient to support the finding that they were principals, not accommodation makers. (See *Jonathan Manor, Inc.* v. *Artisan, Inc.,* 247 Cal.App.2d 651, 654 [56 Cal.Rptr. 14]; *Estate of Chamberlain,* 44 Cal.App.2d 193, 201 [112 P.2d 53, 934]; *Gardiner* v. *Holcomb,* 82 Cal.App. 342, 353 [255 P. 523].) Not being accommodation makers, they were not entitled to suretyship defenses.

Moreover, although controverted, Wimberly testified he discussed the amendment with Donahue and Betz and they did not object to it. A surety is not exonerated by a change in the contract between the principal and creditor when he consented to the change. (Civ. Code, § 2819; *Bloom* v. *Bender,* 48 Cal.2d 793, 800 [313 P.2d 568]; *Michelin Tire Co.* v. *Bentel,* 184 Cal. 315, 323 [193 P. 770]; *Newhouse* v. *Getz,* 8 Cal.App.2d 113, 114 [47 P.2d 306].)

## III

We turn to the attack upon that portion of the judgment decreeing that Donahue and Betz were not entitled to be indemnified by the escrow company for any deficiency that may be recovered against them after foreclosure of the pledge. They contend that the evidence established lia-

---

[8]Commercial Code section 3606 provides in pertinent part: "(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder

". . . . . . . . . . . . . . . . . .

"(b) Unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse."

bility on the part of the escrow company in two respects: (1) It permitted the amendment to the escrow instructions altering the terms of the pledge without their approval or consent and (2) it closed the escrow and distributed the funds without securing an affidavit from Santa Cruz showing that two-thirds of the stock was owned by the Wimberlys.

The first contention merits little discussion. As heretofore noted, although conflicting, there was evidence that Wimberly discussed the amendment with Donahue and Betz and they did not object to it. In any event, the amendment did not result in the loss of the security. At the time of trial the pledged stock was in the hands of Kersten's attorneys.

The second ground upon which Donahue and Betz sought indemnification from the escrow company was its failure to secure a proper affidavit of Wimberly's stock ownership of Santa Cruz as required by the escrow instructions.

Wimberly represented to Donahue and Betz that he and his wife owned two-thirds of the stock in Santa Cruz; the escrow instructions provided that the note was to be secured by a pledge of two-thirds of Santa Cruz stock; and an affidavit of Santa Cruz that two-thirds of its stock was owned by the Wimberlys was required to be deposited in escrow.

The court found that Whitehead's "affidavit" was forged; Santa Cruz did not submit an affidavit of stock ownership; the escrow company failed to examine carefully the purported affidavits of stock ownership; and such failure constituted negligence on the part of the escrow company. Despite those findings, however, the court concluded that plaintiffs were not entitled to be indemnified because "as a matter of law, plaintiffs Betz and Donahue failed to suffer any damage by the negligence of defendant escrow company because no value was shown for the stock."

■ An escrow holder bears a fiduciary relationship to each party (*Amen* v. *Merced County Title Co.,* 58 Cal.2d 528, 534 [25 Cal.Rptr. 65, 375 P.2d 33]; *Spaziani* v. *Millar,* 215 Cal.App.2d 667, 682 [30 Cal.Rptr. 658]); he must comply strictly with the instructions of the principals; if he disburses the property of his principals in violation of his instructions or otherwise breaches that duty, he is liable to the injured parties for breach of contract. (*Amen* v. *Merced County Title Co., supra,* 58 Cal.2d 528, 531-532; *Wade* v. *Lake County Title Co.,* 6 Cal.App.3d 824, 828 [86 Cal. Rptr. 182].) ■ Similarly, it is the duty of the escrow holder to exercise ordinary skill and diligence in his employment and if he acts negligently, he is liable for any loss proximately occasioned by such negligence. (*Amen* v. *Merced County Title Co., supra,* 58 Cal.2d 528, 532; *Rianda*

v. *San Benito Title Guar. Co.,* 35 Cal.2d 170,.173 [217 P.2d 25]; *Banville* v. *Schmidt,* 37 Cal.App.3d 92, 106 [112 Cal.Rptr. 126]; *Spaziani* v. *Millar, supra,* 215 Cal.App.2d 667, 682-683.)

■ In the case at bench the instructions called for the deposit in escrow of an affidavit of the Santa Cruz Company showing that two-thirds of its stock was owned by the Wimberlys. The court found that such affidavit was never deposited. The document which purported to be an affidavit of the president of Santa Cruz bearing Whitehead's name, apart from being a forgery, was not an affidavit. "An affidavit is a written declaration under oath, . . ." (Code Civ. Proc., § 2003.) The purported affidavit was merely an unsworn statement. A notary's signature and stamp at the end of a document is not a verification. (*Dodge* v. *Free,* 32 Cal.App.3d 436, 444, fn. 7 [108 Cal.Rptr. 311]; *Palm Springs Alpine Estates, Inc.* v. *Superior Court,* 255 Cal.App.2d 883, 888 [63 Cal.Rptr. 618].)

Thus, the court's finding that the escrow company was negligent in failing to examine carefully Whitehead's purported affidavit is supported by the evidence. As noted, however, despite the finding of negligence, the court concluded that Donahue and Betz were not entitled to be indemnified because they failed as a matter of law to show any damages as a proximate result of the negligence in that "no value was shown for the stock." It is not entirely clear what was intended by that finding. It could either mean that no damage was shown because foreclosure of the pledge might have satisfied the unpaid balance due on the Kersten note and, hence, there would be no deficiency judgment, or it could mean that the stock could have been valueless.

In his deposition (which was introduced into evidence) Whitehead testified that Santa Cruz owned several parcels of land on which were located "industrial buildings"; the gross rentals from the leases of those buildings were $3,000 per month; and the value of the property was $400,000, subject only to a $35,000 first trust deed. Thus, although there was no evidence of the precise dollar value of each share, there was evidence that the Santa Cruz stock did have a substantial value. In a closely held family corporation such as Santa Cruz, in the absence of other influencing or determining factors, one method for determining the value of a share of stock is by ascertaining the net market value of the property which those shares represent and by assigning to each share its proportionate worth. (*Estate of Rowell,* 132 Cal.App.2d 421, 429 [282 P.2d 163].) Thus, the court's finding cannot be construed to mean there was no evidence that the stock had value.

On the other hand, if the finding is interpreted to mean that Donahue

and Betz failed to prove damages because they failed to show that the sale of the pledged stock would not provide a sufficient sum to discharge the unpaid balance on the Kersten note, the finding would not support the conclusion that they were not entitled to a favorable decree on the issue of indemnification. The judgment as it related to the first action decreed that Kersten was entitled to foreclose the pledge and to recover any deficiency from Donahue and Betz. Until the foreclosure sale takes place, the amount of the deficiency, if any, cannot be determined. This is particularly true where the security consists of stock in a closely held family corporation. The uncertainty whether Donahue and Betz will ultimately suffer a loss did not, however, deprive them of the right to a favorable decree. The distinguishing feature of declaratory relief is that it may be sought before there has been an actual invasion of one's rights. (See *Babb v. Superior Court,* 3 Cal.3d 841, 848 [92 Cal.Rptr. 179, 479 P.2d 379]; *Watson v. Sansone,* 19 Cal.App.3d 1, 3 [96 Cal.Rptr. 387]; *Burke v. City etc. of San Francisco,* 258 Cal.App.2d 32, 34 [65 Cal.Rptr. 539].)

## IV

The final issue concerns the liability of the notary and her surety. Donahue and Betz contend the notary was negligent and that her negligence was a proximate cause of the injury which they sustained.

Despite plaintiffs' request for a specific finding on the issue, the court below failed to find whether or not the notary was negligent or guilty of official misconduct in notarizing Whitehead's purported affidavit. Instead the court found and concluded that Donahue and Betz were not entitled to indemnification against the notary and her surety because they did not "review the affidavit notarized by defendant Gilbert" and "did not rely on the actions" of the notary.

Whether or not the notary was negligent was a material issue. Where findings on a material issue are requested but not made, a reviewing court may not infer that the trial court found in favor of the prevailing party on that issue. (*Weisz Trucking Co. v. Emil R. Wohl Constr.,* 13 Cal.App.3d 256, 263 [91 Cal.Rptr. 489]; *Whitney Inv. Co. v. Westview Dev. Co.,* 273 Cal.App.2d 594, 604 [78 Cal.Rptr. 302].) If the notary were negligent and such negligence constituted a proximate cause of the injury to Donahue and Betz, they were entitled to be indemnified by the notary and her surety. (*Hemet Home Builders Assn. v. Wells,* 3 Cal.App.2d 65, 76-77 [39 P.2d 233].)

The notary and her surety contend that even if the notary were to be found negligent, it would not have been a proximate cause of any injury

to Donahue and Betz because, as the court found, they did not examine the purported affidavit or rely upon the notarial acts but rather relied upon the escrow company and the representations of Wimberly. The contention is devoid of merit.

In *Inglewood Park M. Co.* v. *Ferguson,* 9 Cal.App.2d 217 [49 P.2d 305], a notary was sued by the lender for certifying to an acknowledgment of a forged signature on a trust deed executed to secure a loan. On appeal from a judgment for the lender, the reviewing court rejected the notary's contention that negligent acknowledgment of the document was not the proximate cause of the damage, stating that even assuming the action of the escrow holder in disbursing the funds could be considered to have been "one of the proximate causes," it was sufficient if the notary's negligence were a proximate cause which in the natural course of events produced, either by itself or in conjunction with other causes, the damage sustained by the lender. (At p. 219.)

The notary and her surety contend that even if the notary were to be found to have been negligent, the negligence of the escrow company in failing to examine the affidavit must be imputed to Donahue and Betz and bar recovery under the doctrine of imputed contributory negligence. No authorities are cited for this proposition.

Although for certain purposes an escrow holder has been termed an agent of the parties to the escrow (see *Spaziani* v. *Millar, supra,* 215 Cal. App.2d 667, 682-683), the relationship is not such that justifies imputation of contributory negligence. Imputed contributory negligence is a disfavored doctrine. (Prosser, Torts (4th ed.) § 74, p. 488; 2 Harper & James, Law of Torts, § 23, pp. 1264-1266.) A plaintiff will not be barred from recovery by the negligence of a third person unless the relation between them is such that plaintiff would be vicariously liable as a defendant to another who may be injured, such as the relationship between master and servant or persons engaged in a partnership or joint venture. (Prosser, *supra,* p. 488; 2 Harper & James, *supra,* p. 1273.) The relationship between a party to an escrow and the escrow holder is not that of master and servant. The former justification for the doctrine of *respondeat superior* which was based on control has now been supplanted by the rationale of allocation of risk of loss. (*Hinman* v. *Westinghouse Elec. Co.,* 2 Cal.3d 956, 959 [88 Cal.Rptr. 188, 471 P.2d 988].) Neither the rationale of control nor allocation of risk justifies making an innocent party to an escrow vicariously liable for torts of the escrow holder.

We conclude the court erred in failing to find whether or not the notary

was negligent and whether the negligence, if any be found, was a proximate cause of injury to plaintiffs Donahue and Betz.

### Disposition

Those portions of the consolidated judgment in favor of defendant Kersten and against plaintiffs Cribbs, Donahue and Betz are affirmed. Those portions of the consolidated judgment decreeing that Donahue and Betz are not entitled to be indemnified by the escrow company, the notary and her surety are reversed.

Gardner, P. J., and Kerrigan, J., concurred.